**David MARNELL, Plaintiff,**

v.

**Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.**

**No. C02–4020–PAZ.**

United States District Court,
N.D. Iowa,
Western Division.

March 31, 2003.

---

Dennis J. Mahr, Sioux City, IA, for Plaintiff.

Martha A. Fagg, U.S. Attorney's Office, Sioux City, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

ZOSS, United States Magistrate Judge.

## TABLE OF CONTENTS

I. INTRODUCTION .................................................1054

II. PROCEDURAL AND FACTUAL BACKGROUND ...........................1054
   A.   Procedural Background ....................................1054
   B.   Factual Background .......................................1056
       1.   Introduction .........................................1056
       2.   Marnell's Hearing Testimony ..........................1056
       3.   Testimony of Nancy Marnell ...........................1061
       4.   Testimony of Roy Marnell .............................1066
       5.   Marnell's medical history ............................1067
          a.   Physical functioning ............................1067
          b.   Psychological functioning .......................1068
       6.   Vocational expert's testimony ........................1073

III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND
      THE SUBSTANTIAL EVIDENCE STANDARD ...........................1073
   A.   The Substantial Evidence Standard .......................1073
   B.   Disability Determination ................................1075
       1.   Child claimants ......................................1075
       2.   Adult claimants ......................................1077

IV. ANALYSIS .....................................................1078
   A.   Application for Benefits Under Title XVI .................1078
       1.   Application for SSI benefits as a child ..............1078
       2.   Application for SSI benefits as an adult .............1079
   B.   Application for DI Benefits Under Title II ...............1083
   C.   Application for Child's Insurance Benefits ..............1084

V. CONCLUSION ...................................................1084

## I. INTRODUCTION

The plaintiff Thomas Marnell ("Marnell") appeals a concurrent decision by an administrative law judge ("ALJ"), following three separate hearings, to deny him Supplemental Security Income ("SSI") and Disability Insurance ("DI") benefits. Marnell argues the ALJ erred in several respects in denying him benefits. (*See* Doc. Nos. 12 & 16)

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural Background

Marnell applied for benefits on multiple occasions. He first applied for SSI bene-

fits as a disabled child pursuant to Title XVI of the Social Security Act on April 19, 1983. The application was denied on June 27, 1983, and no appeal was filed. (*See* R. 51, 111; Doc. No. 12, p. 1)

Marnell next applied for SSI benefits under Title XVI on April 2, 1987, with a protective filing date of March 30, 1987. (R. 289–94) The claim was denied initially on May 18, 1987 (R. 295–97), and upon reconsideration on August 4, 1987 (R. 298–300). It appears no appeal was filed.[1]

Following the Supreme Court's decision in *Sullivan v. Zebley,* 493 U.S. 521, 110 S.Ct. 885, 896, 107 L.Ed.2d 967 (1990), Marnell filed an application for SSI benefits as a disabled child on September 14, 1992, with a protective filing date of April 19, 1983.[2] (R. 285–88; *see* R. 51 & Doc. No. 15 at 1–2, both citing *Zebley* ) This application was denied initially on February 16, 1993 (R. 302–04; 354–55), and upon reconsideration on July 27, 1993 (R. 307–310; 385–86). Marnell filed a request for hearing in August 1993. (*See* R. 111)

In the meantime, Marnell filed a claim on September 21, 1992, seeking child's disability insurance benefits under Title II, based on his father's earnings. (R. 24, 111–12; Doc. No. 15 at 2; Doc. No. 12 at 1) He filed a separate application for bene-

fits as an adult, alleging a disability onset date of April 1, 1992.[3] (R. 83, 111–12; Doc. No. 15 at 2) Both of those claims were escalated to the hearing level for consideration. (*See* R. 112)[4]

A hearing was held before ALJ Franklin D. Carroll on August 4, 1994, in South Sioux City, Nebraska, on three of Marnell's claims; *i.e.,* the September 14, 1992, *Zebley* application for benefits as a disabled child; the September 21, 1992, application for child's disability insurance benefits; and the September 1992 application for benefits as an adult. (*See* R. 51, 108–77) Two additional hearings were held on Marnell's applications, one on March 28, 1995 (R. 178–244), and one on April 11, 1996 (R. 245–84), both before ALJ Robert H. Burgess.[5] On March 20, 1998, ALJ Burgess issued three concurrent opinions, denying all of Marnell's claims. (R. 21–44; 48–76; 80–104) On May 20, 1998, Marnell requested a review by the Appeals Council of the Social Security Administration. Marnell's attorney wrote two letters in 2001, to inquire about the status of the case (*see* letters dated 2/16/01 and 9/26/01, at R. 11 & 13, respectively). The Appeals Council finally denied Marnell's request for review on February 22, 2002 (R. 8–10),

---

1. The ALJ's recitation of the procedural history at the first hearing indicates there also may have been an application for benefits as a disabled adult's child filed in March 1987, which also was denied through the reconsideration level and not appealed. (*See* R. 111)

2. In *Zebley,* the Supreme Court held invalid the regulatory procedure for determining whether a child claimant was disabled. Pursuant to *Zebley,* the Commissioner was directed to readjudicate all claims for child disability benefits decided under the applicable regulations up to the date of the decision. Marnell filed this application for benefits in accordance with the *Zebley* readjudication process.

3. The ALJ at the first hearing noted this onset date apparently was chosen because April 1, 1992, is the date Marnell was first insured on his own account number, and thus the earliest date he would be entitled to benefits on his own account number. (*See* R. 113–14)

4. It appears from Marnell's brief (Doc. No. 12 at 2) and the Record (R. 112, 313–15) that in September 1993, another adult child's application was filed. According to the Commissioner, this was a "duplicate application," that was associated with the pending September 1992 application. *See* Doc. No. 18.

5. The Record indicates Marnell's cases were transferred to ALJ Burgess due to the prior ALJ's illness. (*See* R. 180)

making the ALJ's decision the final decision of the Commissioner.

Marnell filed a timely Complaint in this court on March 26, 2002, seeking judicial review of the ALJ's rulings. (Doc. No. 3) The parties consented to jurisdiction over this action by a United States Magistrate Judge, and on April 2, 2002, Chief Judge Mark W. Bennett transferred the case to the undersigned for final disposition. (Doc. No. 4) Marnell filed a brief supporting his claim on August 28, 2002 (Doc. No. 12). On November 29, 2002, the Commissioner filed a responsive brief (Doc. No. 15). Marnell filed a reply brief on December 10, 2002 (Doc. No. 16) The court now deems the matter fully submitted, and pursuant to 42 U.S.C. § 405(g), turns to a review of Marnell's claims for benefits.

### B. Factual Background

#### 1. Introduction

The court notes at the outset that this is a difficult case for several reasons. The first hurdle is the scope of the record under review. Marnell's applications for benefits and their course through the administrative system encompass nearly nineteen years, three administrative hearings, three separate ALJ opinions, and eighteen years of medical and psychological records, resulting in a record nearly 1,000 pages long. The second, and more problematic, hurdle is the nature of Marnell's claimed disability. Marnell lost the vision in his right eye in 1978, due to a childhood accident. He apparently has had some problems with the vision in his left eye, although, as discussed more fully below, the record is inconsistent with regard to the degree of these problems. However, also as discussed below, Marnell's eye problems, standing alone, do not appear to be disabling. The most difficult

aspect of this case is Marnell's psychological makeup. Although not diagnosed with any particular mental illness or easily defined personality disorder, it is evident Marnell has significant difficulties in dealing with others, acting appropriately in social and work situations, and controlling his behavior.

The court has reviewed every page of the voluminous record and will not summarize the entire record here. What follows are highlights from the record that present the background for discussing Marnell's claims for benefits.

#### 2. Marnell's Hearing Testimony

Except for appropriate citations to the record, the court otherwise will not differentiate between the three hearings in discussing the hearing testimony as a whole.

Marnell was born on August 17, 1967. He is single, 5′6″ tall and weighs about 130 pounds. He is right-handed. (R. 115) Marnell lost his right eye at age 11, when he was shot in the eye with a BB. (R. 117)

Marnell repeated kindergarten, first grade, and third grade, due to poor grades. (R. 133) Marnell finished the ninth grade in school, and has not received any further education.[6] He was never a good student, and although he liked science and history, he never liked school in general, stating, "[I]n my opinion, they never taught you nothing about life. They taught what they thought you needed to know and that was it." (R. 134, 138) He was truant frequently, missing 15 to 20 days a year, or leaving school before the day was over because he did not want to be there. Marnell stated he "disliked the teachers and they seemed to me they weren't, I'd go to ask a question and they'd

---

6. The Record is unclear as to whether Marnell actually finished the ninth grade, or quit school during the ninth grade. Either way, it appears Marnell was 19 years old in the ninth grade, due to repeating several grades of school. (*See* R. 201)

tell me to be quiet and sit down and do my work." (R. 134–35) Marnell also would fake illness because "it worked on my parents [and was] a way to get out of school." (R. 142)

Marnell's parents moved a lot when he was in school, and as a result, he attended five or six different grade schools in Iowa, and three more schools in Louisiana. He was sometimes in "special classes" for reading and math. (R. 135–36) He last attended school in Whiting, Iowa, and stated the Whiting school was harder than other schools he had attended. He did not get along well there "[b]ecause the Whiting School was set up for the rich kids and if you didn't have money, you weren't, you know, you weren't nothing." (R. 136; *see* R. 187–88) His perception "made a lot of difference as far as [his] attitude [toward] faculty and toward the school itself." (R. 136–37) He felt he was treated differently than "the richest farmer's kids in that school," stating it was "like I was a lower class human being." (R. 137) He felt the "rich kids" were given extra time to get things right, whereas if he had trouble with something, he was deprived of recesses and made to repeat tasks "until I got it right." (*Id.*)

Of the ten grade schools Marnell attended, he felt most of them treated him unfairly. In his opinion, the teachers did not do their jobs and verbally abused students. He admitted he got into fights with his teachers and sometimes got detention for cussing at his teachers. (R. 137–38, 142–43) He got into frequent fights with other students, as well. He stated that when he was in ninth grade, an assistant principal told him to leave and not come back because he "was fighting too much in the school." (R. 142–43)

Marnell tried to participate in sports at the Whiting school but was not successful. He was kicked off the football team for hurting another player, and he was not tall enough to play basketball. He stated he had no other extra-curricular activities because he "despised the town[,] . . . despised the people and . . . despised the school." (R. 144)

Despite his difficulties in school, Marnell views himself as a fairly intelligent, self-taught person. He reads books and claims to remember most of what he reads, "[a]lmost verbatim." (R. 188) He considers himself to be self-taught in psychology, early European history, and botany. (R. 188–89) He also likes to read Louis L'Amour novels. Marnell stated he can only read about fifteen minutes at a time before his eye blurs and he has to stop and rest. (R. 125, 138) The amount of time he can read has gradually gotten worse because his "vision blurs a lot more" and he is "starting to see double vision out of [his] left eye." (R. 157) He has not attempted to get a driver's license because he believes the state would not give him a license. (R. 126–27; *see also* R. 339, 898) His parents will give him rides to wherever he needs to go. (R. 162)

Marnell said he owes the University of Iowa Hospitals and Clinics about $1,000, and he has numerous other outstanding medical bills. He has no money, and has never had a savings account. He had a checking account once, in 1990, and the most he ever had in his account was $300. Except for some vocational assistance, discussed later in this opinion, the only public assistance Marnell has ever received was some medical assistance at one time from the State of Iowa. Although his parents were on public assistance frequently when he was growing up, Marnell has never gotten Medicaid, Medicare, food stamps, or any type of disability payments. (R. 132–33, 152–53)

Marnell was diagnosed with glaucoma in the blind right eye in 1990. (R. 118) For six months to a year, he used Timoptic

drops four times a day for the glaucoma. He got a six-month supply free from the University of Iowa, and his parents paid to refill the prescription one time, but he quit using the medication when the refill ran out because he and his parents could not afford further refills. (R. 129–31, 171–72, 175) He stated the Timoptic drops were "mainly . . . just to control the pressure." (R. 171) He also tried an ointment and sodium chloride eye drops, but stated he quit using those because the "medicine build up in [his] right eye . . . was getting worse then [sic] the glaucoma itself." (R. 176)

Marnell admitted he uses marijuana on occasion to control his glaucoma. He stated the marijuana lowers the pressure in his eyes. (R. 270)

Marnell stated he has "pressure problems" with his left eye, but has not been diagnosed with glaucoma in the left eye, and he does not treat his left eye with drops or other medications. (R. 118, 126) He does not wear glasses, although he stated he needs them and glasses were prescribed for him by an optometrist in 1980. (R. 126, 139) He feels his left eye is subject to strain because of the blindness in his right eye. (R. 117) He has never had an MRI of his head, and Social Security has not sent him to see an eye doctor. (R. 140) Marnell stated he cannot afford to have his eyes examined regularly. (R. 157) There is no free clinic near Whiting, and he is not covered by any health insurance. (R. 146) He does not receive regular medical care and has no family doctor. He saw various doctors during his childhood and youth on an as-needed basis, such as for appendicitis and when he broke his foot. (R. 141)

Marnell stated he has frequent migraine headaches, which he attributes to "the trauma that I experienced in my eye and it puts pressure on the optic nerve." (R. 128, 139–40, 156–57) The headaches some-times come on when he is "stressing my eyes out like trying to read small print," or from trying to read for too long at a time. (R. 157) When he gets a migraine, Marnell will "just eat aspirins and Tylenol and ibuprofen and sometimes they work, most times they don't." (*Id.*) He sometimes will go into a dark closet, which will "take some of the pressure off [his] eyes." (*Id.*)

Marnell stated he gets light-headed several times a day and it affects his equilibrium. He also gets light-headed from quick movements, like twisting or arising quickly from a sitting or squatting position. Marnell stated his light-headedness and dizzy spells started around the time he was first diagnosed with glaucoma. (R. 156) No doctor has ever told him what causes his dizziness, and he has not sought treatment from a neurosurgeon. (R. 148–49, 155, 156) He feels his ability to climb stairs and ladders is limited, stating, "I got to watch about how high I go in case I get light-headed so if I fall I don't get hurt." (R. 149) He stated he fell off a ladder twice due to light-headedness when he was 14 or 15 years old, while he was painting the outside of a house. He attributes the light-headedness on those occasions to the heat. (R. 149–50) He also described two occasions when he became light-headed and fell down the stairs. (R. 150) Marnell said his depth perception is "[n]ot very good." (*Id.*) He runs into things occasionally, and he sometimes has difficulty reaching for objects with either hand. (R. 150–51) Marnell is not good with tools because he lacks manual dexterity. He stated he has "never had dexterity" in his fingers or hands, but he has never been examined by a doctor for this problem. (R. 151) He also has problems walking because he will "misjudge like the height in the ground, the evenness of it," and he sometimes will "step up too high or stub [his] toe." (R. 172) He reported he has fallen down "quite a lot." (R. 173)

Marnell has tried working at various jobs during his lifetime. He tried working as a farm hand, but was bothered by the dust. (R. 116) His first job, at age sixteen, was walking down rows of planted beans and cutting out weeds. He quit the job after a couple of weeks because the dust bothered his eyes.[7] (R. 116–17, 118)

In 1986 or 1988, Marnell worked briefly in a cafeteria as part of a vocational rehabilitation program. He would "wash the tables and serve food and help the cooks and wash dishes, such as that, and they'd pay you so much per day for doing it. And each time you did the successful thing they'd evaluate ... [you.]" He was not paid for this work. (R. 154–55)

He tried working at a meat packing plant in 1988 or 1989, on the ham boning line, taking the tailbones out of hams. The job required him to be on his feet all the time and to use a vibrating knife with a circular blade that spins. He had to lift the hams, which weighed about 30 pounds each. He only stayed at that job for about a week because his "tendons were being stretched out and [the] rest of [his] arm was swelling up," causing him to be unable to hold onto the knife. (R. 119–20, 146–47)

Marnell tried working at Cloverleaf Cold Storage in late 1989 or early 1990, as a lugger, carrying boxes of meat. The job required him to be on his feet all the time, and to lift boxes weighing anywhere from 35 to 60 pounds. He worked there for about two-and-a-half weeks. He left because the cold and long hours were affecting his eyes. (R. 120–21)

From January 2, 1990, through March 25, 1990, Marnell worked at MCI as a telemarketer. He either quit or was fired

because of problems with his coworkers. (*See* R. 222–23, 265)

In the winter of 1990, Marnell tried on two separate occasions to do night cleaning at IBP. He was required to hose down all the machines and scour them. He used long hoses to spray 180–degree water, under high pressure (200 psi), onto the machines. The job required him to be on his feet all the time. He left the job the first time because the heat and steam from the hot water made him light-headed. He tried the job again about a month later, and left for the same reason. (R. 121–22, 147)

Marnell tried doing janitorial work for a building maintenance company from September through October 1992. He would clean offices, doing sweeping, vacuuming, dusting and the like. He also mopped the bathrooms. He was required to lift ten or fifteen pounds. He left the job because the dust and the hours "stressed out [his] eyes," and he had to take frequent time off from work. (R. 122–23, 148) The most Marnell ever made on a job was $5.50 an hour, which was the starting pay at Cloverleaf Cold Storage. He never got beyond the starting pay at any job. (R. 148)

Marnell has relied on family support, and has lived with family members for most of his life.[8] He stated he has applied for "a couple hundred" jobs over the years, but he does not have management skills, and he believes he has not been hired for manual labor jobs due to his partial blindness. (R. 124, 133) He has never applied for or received unemployment benefits. (R. 165–66) He went to Des Moines Voc–Rehab at one point for an evaluation, but stated, "the first time I was down there I viewed the place as a joke and I walked

---

7. Marnell was paid in cash for the brief time he was on this job, so his income from the job does not appear on his earnings record. (R. 155)

8. At the time of the first hearing, he was living with his parents in Whiting, Iowa. At the time of the second hearing, he was living with his brother about thirteen miles from Whiting. (R. 184)

away. And in order to get back in I had to go see a psychiatrist for six weeks." (R. 153) He felt the program was being run "more as a military barracks then [sic] as students trying to go through an evaluation program. And they were trying to also force students ... to sign up for their job club, which takes another six to eight weeks. And there was several of us that decided that we weren't going to do it no matter what." (R. 154; *see also* R. 173–74; R. 187)

He tried the Voc–Rehab program again, but never finished the evaluation, explaining, "Well, they said ... that I was threatening people and that I demanded to see the Governor and a lot of other stuff. And they said that I was drunk and so I got tired of it and I told them just to give me a bus ticket home." (R. 153) The State of Iowa paid all of Marnell's room and board while he was in the program. (R. 154) He felt the program was "a waste of taxpayer's money." (R. 187) He never made a third attempt to obtain a vocational evaluation. (R. 155; *see also* R. 174)

Marnell stated he can lift an object weighing 30 to 35 pounds, but he cannot hold onto the object for very long because he "can't hold a steady grip." (R. 158) He attributes his lack of grip strength to the repetitive wrist movement while he was on the job at John Morrell. (R. 160) He does not believe he could perform a job that required pushing and pulling, such as running the controls on a bulldozer or forklift, because he has "a tendency to forget on which lever controls what." (R. 159) He feels he is not coordinated enough to run something with levers or foot pedals. (R. 163) He has trouble reaching objects that are low down because he gets dizzy when he reaches down or squats. He gets down on his knees to pick up a pair of shoes from the closet or get something out from under the bed. (R. 159–60) Marnell stated he tends to get in accidents a lot because he is uncoordinated. (R. 163)

Marnell's last pair of eyeglasses were broken during a bar fight in 1990, at the Dog House bar in Sioux City. He stated this was the only fight he has been in since he left school in the ninth grade. (R. 158) He explained that he thinks about being violent but does not do it because he is "not going to spend the rest of [his] life paying for it." (R. 159) He stated he has occasional problems with alcohol, and he will "get falling down drunk sometimes," so "that's why [he doesn't] drink very much anymore." (R. 161) However, he also stated he uses alcohol to excess "two to four times a month." (R. 164) He gets the alcohol from his brothers, who also drink. (R. 165) Marnell pled guilty to a public intoxication charge in connection with the bar fighting incident at the Dog House. (R. 161–62) He has never driven a car drunk. (R. 162)

Marnell said his dream is to own a ranch and "[r]un cattle, horses." (*Id.*) He helped his uncle herd cattle when Marnell was a child. He would feed the cattle, empty out and refill the water tanks, break the ice in the winter so the cattle could get water, and help give them shots. (R. 162–63)

As far as hobbies, Marnell likes to fish. He goes fishing three or four times a week, usually "at night ... all night long." (R. 164) He has no restrictions on the amount of time he can sit. (*Id.*) He also likes to hunt rabbits and squirrels. He hunts with a shotgun, and he does not use any special type of sight, but generally will "just point and, hopefully, I hit it." (R. 165) [9]

---

**9.** At the time of the first hearing on August 4, 1994, Marnell was not engaging in these activities because he had suffered burns to his right leg in an accident while trying to start a friend's three-wheeler. (R. 169–70) Marnell knelt down in some gasoline that was ignited by a spark. (R. 186) He suffered burns from

Marnell stated he cannot dust or vacuum around the house because the dust and lint that gets stirred up irritates his eyes. He never washes windows because he is afraid he will get chemicals in his eyes from spray cleaners. He does not climb ladders. He does not shovel snow and will only go outside in the winter when he has to, and then he wears very dark sunglasses because the brightness bothers his eyes. (R. 166–67) Marnell stated light has bothered him since at least 1980. Brightness blinds him, causing "like a great big spotlight right at my face." (R. 167) Wearing an eye patch over his right eye does not help because bright light also affects his left eye. (R. 167)

Marnell does not mow the lawn because grass fragments blow up into his face. He does not wash dishes because he is "a klutz" and has "a bad habit of accidentally dropping a plate or a cup." (R. 168)

On a typical day, Marnell will watch television, talk with family members, and maybe try to work on a jigsaw puzzle, which he stated takes him "a long time to do." (*Id.; see* R. 183) He sometimes helps babysit his nieces and nephews. (R. 183, 185) He can watch television for up to a half hour before it starts to blur, and then he will do something else for awhile. He can work on a puzzle for about 15 minutes, "and then the colors start to blend together." (*Id.*) He also listens to the radio, which is one of his favorite activities, and he reads Louis L'Amour westerns. It takes him about a month to get through one of the novels, reading for ten to fifteen minutes at a time. (R. 169) Marnell stated he does not sleep well and is restless at night. He has always been an insomniac and is often up until 2:00 or 3:00 in the morning before he can go to sleep. (*Id.*)

just above his right knee down to his ankle,

### 3. *Testimony of Nancy Marnell*

Marnell's mother, Nancy Marnell, testified at the second hearing. She and Marnell's father were married in 1957. The Marnells have seven children, who were ages 25 through 37 in 1995. David Marnell, the claimant in this case, is the next-to-youngest child. (R. 191)

Mrs. Marnell stated her husband receives Social Security disability income due to chronic lung problems including emphysema, asthma, and bronchitis. The Marnell family's sole income has been these disability payments since before Marnell's first application for benefits in 1983. (R. 193–94)

Neither of Marnell's parents agreed to testify unless Marnell was outside the room. Mrs. Marnell explained this was "because David has certain problems that we would rather not discuss in front of him. Because he would get upset and angry over." (*Id.*) She stated she and her husband sometimes fear for their safety around Marnell, explaining:

[H]e talks about things that are totally off the wall. He talks about killing people. He talks about blowing things up. And he talks about guns and knives and different things like that. Just about every day. And it's kind of apprehensive [sic] to be around him because I really don't know how strong his mind is. If he might, you know, sometime go off and actually do something to someone.

(R. 192)

Mrs. Marnell said when her son was in high school, he cut the heads off several little kittens with a coring knife. Marnell told her he did this because he was angry with her. Mrs. Marnell feared "if he could do that to an animal, then he could probably do it to a person too." (*Id.*) He also

requiring skin grafts. (R. 127–29, 182)

was mean and cruel to dogs, kicking and hitting them. (R. 238) She gave a second example of why she fears Marnell, describing an incident that occurred in November of 1994, as follows:

[O]ne night he took—when he had a shotgun, one night he sat up all night and he said that he was watching the house because he got paranoid. And he said there was someone trying to break into the house, and he sat up all night with the shotgun. And he kept clicking the bolt in and out. It was loaded. And we were afraid to go to sleep because we thought maybe that if we went to sleep that he would think we broke into the house and blow us away. I don't know what caused him to do it, but he has did that one night for sure.... He came to our house and stayed there, and he sat up all night. And my husband said that he thought about taking him to [the mental hospital in] Cherokee[, Iowa,] and he said he didn't know if they would let him, you know, just taking him over there and putting him in the mental institution. And he said he didn't know if they would take him in or not.

(R. 225) He has been paranoid on other occasions, thinking people were following him and were going to try to kill him. (R. 234) Mrs. Marnell stated she has become increasingly afraid of Marnell in the past year. He cannot go a day without getting angry. (*Id.*) His mother opined, "Sometimes I think that if he ever went off the deep end then he might hurt somebody really bad." (R. 239)

Mrs. Marnell confirmed that Marnell works jigsaw puzzles, which he can do for 30 to 45 minutes at a time. (R. 226) He also reads Louis L'Amour novels and other "[e]asy books," but she was not aware he had any interest in history, botany, or other areas. She stated Marnell has "a very, very vivid imagination," and he "imagines things and just tells stories about them." (R. 196) She believes Mar-

nell tells stories in an attempt to make himself look better to others or feel better about himself. (*Id.*) She was aware that Marnell was reading an old psychology book, but stated he was not very far into it, and to her knowledge, he had not read other psychology or psychiatry books previously. (R. 197) She confirmed that Marnell's eyes get tired when he reads, and he gets occasional dizzy spells. (R. 200–01) To her knowledge, Marnell has never seen a neurologist to investigate the cause of the dizzy spells. (R. 201)

Marnell's teachers told his mother that Marnell "talked too much in class," "did not do his work," didn't finish his assignments, and "a lot of his work was totally incomplete." (R. 202) Mrs. Marnell and her husband tried to get Marnell to improve his schoolwork, but she said Marnell is "hard headed" and would not listen to them. He would do well for a day or two, and then "slough off again and just go back to his old ways." (*Id.*) He had trouble completing school work and could not concentrate for long periods of time. (R. 231)

Mrs. Marnell believes Marnell's teachers passed him through to the next grade "just to get rid of him. Because sometimes David was very disruptive in class." (R. 202) He was kept after school frequently for discipline. His parents also disciplined him, without results. (R. 202–03) He played hookey from school a "[c]ouple of times a week if he could get away with it," usually without his mother's knowledge. (R. 223)

Marnell's parents did not send him to a psychologist or psychiatrist, believing it would not help. When Marnell was in kindergarten, his school sent him to a psychologist, who told Marnell's parents that he was a "slow learner" and "behind his age." (R. 203) Marnell was sometimes placed in special education classes, but

Mrs. Marnell stated Whiting's "special education leaves a lot to be desired." (R. 203)

Mrs. Marnell spoke with Marnell's school counselor at the Whiting school three or four times when Marnell was in the ninth grade, at age nineteen. The counselor told her Marnell "had a lot of problems in school," "didn't get along with the other kids," "didn't do what the teachers told him," "never finished his work that they gave him," and "often got up and ... argued with the teachers and ... the other kids in school." (R. 204) She did not remember the counselor ever proposing any solutions to help Marnell. The counselor was able to get Marnell into the vocational-rehabilitation program in Des Moines, but Marnell failed to follow through with the program. (R. 204–05) His mother explained Marnell only stayed in the program for two weeks:

> And then he took off with some kid that he met in Des Moines, and we didn't know he was gone. And they called me and said, is your son home? And I said no, he is supposed to be in Des Moines. And the man or woman ... that was running the vocational rehab, said he has took off, and we don't know where he is, and we can't find him. And he was gone for a month. And my husband and I were just worried sick. We didn't know what happened to him. And he came back at the end of the month. He finally called my son Harold from Missouri Valley, and he had been hitchhiking clear away up to Nebraska and into Colorado. And he had—my son went and picked him up and brought him back to Whiting at that time.

(R. 205)

Mrs. Marnell stated she usually sees Marnell for at least a part of every day, but two or three times a month, he "takes off and goes places," staying away for three or four days at a time without telling anyone where he is going. He "hitchhikes up and down the road," and she is concerned for his safety. (R. 198) When the family lived in Sioux City, Marnell would hitchhike to Whiting to see friends and family in that area. She explained that in 1992, Marnell "took off one time and hitchhiked to Norfolk, Nebraska in a blizzard. In the middle of winter. Which I didn't think was too bright, but he did it anyway." (*Id.*)

Mrs. Marnell described her son as not having many friends. He played with other children when he was young, but by the time he was 17 or 18 years old, people were afraid to be around him "because of his attitude, ... the things he talked about and the off the wall remarks that he made." (R. 231) He wanted to play sports, but was unable to do so because of his eye problems and the requirement for expensive special glasses. (R. 232) She only knew of one girlfriend Marnell had had in his life, during the summer of 1992, but they broke up after a short time. (R. 207–11) His mother does not think Marnell "knows how to have a real good relationship with a girlfriend." (R. 210)

Mrs. Marnell was not sure her son would be able to handle funds on his own if he were to receive disability income. He had a checking account once, but he failed to keep the account balanced and "wrote a lot of checks and they bounced." (R. 212) Marnell apparently claimed someone had stolen checks from his checkbook, but his mother did not believe him. Marnell was threatened with criminal prosecution for the bad checks, and he paid off the checks with part of an income tax refund. His mother said he spent most of the tax refund on "foolish things." (R. 211–12)

Nevertheless, Mrs. Marnell believes her son could live on his own, "if he would try." (R. 234) The only time he has tried was in Des Moines, and she stated "he would

have done a pretty good job of it if he had tried to get along with the people that were around him." (R. 235)

Regarding Marnell's physical functioning, his mother stated he sometimes complains of his knee or leg hurting when he walks, and she has seen him limping. He can use his hands, but he is clumsy with tools and not well coordinated. She attributed this to his limited vision. Mrs. Marnell said her son runs into things on his right side, and described him running into doors, people, a car door, and trees. She does not believe Marnell is as careful as he should be. (R. 214–15) To Mrs. Marnell's knowledge, her son has no trouble squatting or reaching overhead. (R. 220)

Marnell has never tried to get a driver's license. His mother explained Marnell is "afraid that if he gets a driver's license, even if he could pass the test, he was afraid that something would happen to where he might have an accident. And he says he doesn't want to run into anybody and kill anybody or kill any little children. Because he says he doesn't trust his eyesight that well." (Id.) However, his mother knows he can drive because in about 1992, Marnell bought a car in Des Moines and drove it home, despite not having a license. (R. 223)

Marnell has not received regular medical care since he was 19 years old. He is not covered by insurance and cannot afford to pay for medications and doctor visits. (R. 216)

Mrs. Marnell stated Marnell's memory is not "[a]s perfect as he thinks [it] is." (R. 216) She does not believe his claim that he has a photographic memory, and stated he has "flight of imagination," giving the following example:

[F]or one thing, he thinks that he is gifted. That he can read people's minds. He thinks that he can read—he told me that he can take his thoughts and send his thoughts into other peo-

ple's minds and make them do what he's thinking. The thought. And he says that he can see demons. And he says he knows when trouble's coming because he can see these demons come around. And he says they're like little round black things like—from a golf ball clear to a baseball. And he says they go into people[.]

(R. 217) Marnell claims he can feel other people's emotions. (Id.) He has told his mother he can see into the future, and he can "go to the cemetery and observe spirits of people." (R. 226) She thinks Marnell may have picked up information for his stories from television, and stated he watches a lot of horror movies. (R. 2119) Marnell's brother, with whom he has been staying, reported to their mother that Marnell sometimes "behaves pretty strange," but she was unable to give specific examples. (Id.)

She stated Marnell has talked about killing people when he gets angry, telling her "that he would like to take a gun and blow them away. Or he would like to take and make a bomb and blow them up." (R. 227) He has been rather specific on occasion, for example telling his mother, "I know where the gas main is in Whiting. And I could turn it on and fix it so that it would blow up and it would go through the pipe and blow up the whole town." (R. 240) Marnell had a baby brother who died three hours after birth, and he "just stood there and laughed" at the funeral. (R. 230) Mrs. Marnell and her husband have considered committing Marnell several times, but never sought legal assistance to help them follow through with it. (R. 227–29)

Mrs. Marnell said her son has had problems with alcohol in the past, but has "sort of slowed down on it" from time to time. He started drinking when he was about 18 years old, and would go drinking with his brother. Mrs. Marnell has seen her son

drunk "[t]oo many times to even number," and stated Marnell becomes belligerent and argumentative when he is drinking. (R. 221–22) He will "try to argue over anything that is really of no importance," and "will start yelling and hollering." (R. 222) She noted Marnell was arrested once on a drunk and disorderly charge, but otherwise he has never been arrested. (R. 212–14)

She stated Marnell has never held a job for long because "he can't get along with his co-workers for one thing." (R. 222) She described an incident when Marnell worked at MCI, as follows:

> [W]hen he worked for MCI he got mad at one of the people that worked beside him because he said that she was talking too loud. And got into an argument with her. And he threatened her. So she went and got her husband. Her husband worked at the same—in a different area at the same place. And he came over there and they all got into a great big argument. So David quit. Either quit or was fired over it. Because he couldn't get along with them.... I know that he went back there and talked to [them] and they told him they never would hire him back.

(R. 222–23)

She stated Marnell does not take criticism well, and gets angry when he is criticized. He has few life goals, and does not follow through on things he talks about doing, like finishing his education. She does not believe Marnell is capable of working a 40–hour–a–week job anywhere, and he could not, for example, take a list of ten things that needed to be done and complete them. She explained, "[H]e doesn't like to follow orders and he doesn't like to do the things that you would write down on a list. He would like to take shortcuts to get around that. And there-

fore it never would be completed." (R. 235–37) She similarly doubted he could complete even three items on a list. If someone tells Marnell what to do and how to do it, "he thinks in his mind that it should be done a certain way and he would get in trouble by not obeying what they tell him to do." (R. 237)

Regarding Marnell's day-to-day activities, his mother said he washes his own clothes, but she does not know of other housework he does. He is able to help her with things around the house "if he wants to," but she noted that dust and blowing grass would bother his eyes and prevent him from mowing the lawn.[10] He also would have difficulty shoveling snow because the sunlight would bother his eyes. (R. 225–26) He sometimes helps till the garden, but he has never grown anything on his own. (R. 195) Marnell seems to have a normal amount of energy, and a regular appetite and diet, although sometimes he will go an entire day without eating. (R. 230)

She stated Marnell sometimes babysits for his nieces and nephews, who are between 3 and 10 years of age. Mrs. Marnell stated she does not think her son would ever hurt a child, and the children "just love him." (R. 224–25)

Mrs. Marnell explained that Marnell used to go hunting, but his father did not trust him with a gun and disposed of Marnell's gun. When Marnell was hunting, he occasionally would bring home squirrels and rabbits, and he once brought home a pheasant, but he was not very successful at hunting. (R. 194–95)

Mrs. Marnell believed her son fooled a psychiatrist who examined him on behalf of the Social Security Administration in 1987, when he was 19, because he bragged to her that "he was going to fool the

---

10. However, when asked to give examples of things Marnell will finish, his mother stated, "if he mows the lawn he will finish that." (R. 235)

psychiatrist into thinking that everything was perfectly normal with him." (R. 241) She stated Marnell "doesn't want to admit that he has problems." (*Id.*)

### 4. Testimony of Roy Marnell

Marnell's father, Roy Marnell, testified briefly at the third hearing. He stated Marnell lives with him most of the time. Mr. Marnell gets Social Security benefits, and his wife gets "a small SSI check," and they pay Marnell's living expenses. (R. 252–53) Marnell has no income, and has not worked since the early nineties. (R. 249–50, 252–53) Mr. and Mrs. Marnell help their son with medical expenses when they can, but Marnell has no other money for medications and doctor visits other than what his parents can afford to give him. (R. 254)

Unlike Mrs. Marnell, Roy Marnell stated he is not afraid of his son, but "would be cautious of him," explaining:

> [S]ometimes he gets with these, with these different people and they give him different kinds of dope and alcohol and stuff like that and he just, with his mind the way it is, he just can't handle it and one instance here. It was a while back in '94[,] I think it was. I had just gone to the hospital for my other carotid artery I think it was and he had been down to, I don't know where, somewhere and got a hold of some crank, cocaine, and he set there all night long with a .28 gauge shotgun. She got the shells out of it and stuff like that and so, like I say, we don't know who he sees or where he goes so if he—we can always tell whether he's had something or not because of the way his facial expressions show up and stuff like that. It'll cause different muscles of his face to work different and stuff like that if he gets into it.

(R. 251)

Marnell also has problems when he is sober, but the problems gets worse when he uses alcohol or other substances. (*Id.*) Mr. Marnell stated Marnell "drinks beer quite a bit," and uses "quite a bit of marijuana." (*Id.*)

Mr. Marnell has "a real difficult time" getting along with his son. Mr. Marnell is "a mechanic by trade," and he has tried to let Marnell work with him, but Marnell thinks he knows how to do things and will begin fighting and arguing with his father. (R. 252) Marnell also becomes very argumentative at home, and because of Mr. Marnell's tenuous physical condition, he just quits talking and walks away from Marnell. (*Id.*)

Mr. Marnell confirmed that it was difficult to keep Marnell in school. He stated that after Marnell lost the sight in his right eye, "the real emotional problems started to coming out." (R. 254) Marnell's attitude and tendency to argue about everything became worse. (*Id.*) He got into fights at school and was often disciplined, but nothing ever changed Marnell's attitude. (R. 258–59)

Mr. Marnell said his son is "very argumentative," and has few friends, stating "people that do have anything to do with him are those that want him to drink and use drugs and stuff with [them]." (R. 255) Marnell had few friends as a child, and could not keep friends because of his attitude problem. His father said Marnell "is a boy that has trouble getting along with other people." (*Id.*) His friendships have never been substantial, and have largely been "fair weather friends" who "wanted him to drink and do dope with them." (R. 257)

Mr. Marnell stated his son believes in God, but does not go to church. He opined this is because Mr. Marnell was a Pentecostal minister while Marnell was growing up, and he made his children attend church when they were young. In addition, he thinks Marnell quit attending

church because "just his attitude toward, well, society and anything that has an authority or anything like that over him." (R. 256)

Mr. Marnell opined his son was worse mentally at age 27 than he was when he was in high school, stating if Marnell "would talk to a psychiatrist the way he talks around home sometimes they'd probably put him on some kind of mental medication or something." (R. 259) He stated Marnell claims he talks to demons. He believes Marnell "has mental problems serious enough that he should be treated some way but on the other hand, he's smart enough he doesn't let the psychiatrist see it." (*Id.*) He never tried to have Marnell committed because "they could only hold him a certain length of time, which would not do him a whole lot of good," and Marnell would just return to his father's home when he was released. (R. 259–60)

Mr. Marnell does not believe Marnell could ever live on his own. (R. 260) He stated Marnell got an $800 tax refund that he squandered in a few days. He got a settlement for a leg injury of $8,000, and spent the money in six to eight weeks. He bought his father a car for $1,500, and bought his father a recliner and some clothes. He bought himself a rifle and a shotgun. He gave a little money to his brother and some to a cousin, and he took a two-week vacation to see his sister in Louisiana. When he returned from Louisiana, "he was broke." (R. 261)

In discussing the incident when Marnell sat up all night with a shotgun because he thought people were trying to break into the house, Mr. Marnell believes his son was hallucinating because he had been using drugs. He stated, "It would have been the only thing that would have turned his mind the way it did. That was not normal behavior for David, not to that extent." (R. 264) Mr. Marnell does not, however,

believe that drugs are a contributing factor in his son's mental condition. Using drugs only makes his condition worse. (*See* R. 268–69)

### 5. *Marnell's medical history*

The court has reviewed the voluminous Record in this case in some detail, and will discuss Marnell's medical history in summary fashion. Preliminarily, the court notes the Record contains evidence that Marnell suffered a burn from his knee to his ankle on his right leg as the result of some gasoline igniting when he was trying to start a friend's three-wheeler. The injury required some skin grafts. Marnell appears to have recovered from that injury, and his leg condition is not a part of his application for benefits in this case, so the court will not discuss the injury further. (*See* R. 127–28, 647–770)

#### a. *Physical functioning*

The Record confirms Marnell lost the vision in his right eye in 1978, due to an accident. He has had ongoing problems with glaucoma in that eye since approximately 1990. He has done well on prescription medications including eye drops and Inflamase Forte, but at times has not used his medications consistently. In April 1992, he was diagnosed with severe keratitis in his right eye. He had cyclo-cryotherapy for his glaucoma at the University of Iowa Hospital ("UIH") in July 1992, which provided him with significant relief. Pressure in his eye returned in July 1993, and he was seen for a follow-up examination at UIH on July 22, 1993. He reported he was not using his eye medication because it would build up in the corner of his eye. The doctor urged Marnell to wear safety glasses. At his next visit on August 12, 1993, the doctor noted Marnell still had not gotten the safety glasses.

In about 1984, Marnell began experiencing dizzy spells and headaches, and was diagnosed with migraines. Records indicate he got some relief on Inderal, but he never followed up on a referral to a specialist and did not see a doctor again until 1986. A physical examination on January 8, 1986, indicated Marnell was in good health, and aided vision in his left eye was 20/20. In August 1993, at the follow-up visit for his right eye, Marnell reported that he could feel glaucoma attacks in his left eye, but the record contains no diagnosis of glaucoma in Marnell's left eye at any time. A visual analysis of his left eye in April 1996, indicated he had tunnel vision in that eye, and his peripheral vision was limited to 120 degrees. The doctor noted Marnell would be unable to get a driver's license "or do any job that requires peripheral vision." (R. 898)

In summary, the Record confirms that Marnell is blind in his right eye, has ongoing problems with glaucoma in that eye, and has some restriction of his vision in the left eye. Otherwise, the record contains no objective evidence that Marnell is impaired physically in any manner. The Record also contains no evidence that Marnell complained to any treating physician about problems with his hands, grip strength, or any other problems relating to his physical functioning. Other than his vision difficulties, the Record indicates Marnell does not have, and never has had, any physical restrictions relating to his ability to work.

### b. Psychological functioning

As noted previously, the most difficult aspect of this case is Marnell's psychological functioning. During the nineteen-year course of his applications for benefits, he has been evaluated numerous times by mental health counselors, psychologists, vocational rehabilitation professionals, and psychiatrists.

Marnell underwent a psychological/intellectual assessment on July 21, 1987, a few weeks before his twentieth birthday, at the request of the Iowa Department of Disability Determination Services ("DDS"). (R. 409–15) Psychologist John A. McMeekin noted Marnell was boastful, pretentious, disrespectful, overreactive, loud, angry, and grandiose. Marnell disagreed with almost everything his mother said during the interview. He would raise his voice almost to the point of yelling until Dr. McMeekin told him to keep his voice down. Dr. McMeekin opined Marnell's main difficulties in the area of social skills appear to be "anger, hostility, and a very low threshold for reactivity." (R. 410)

Dr. McMeekin noted Marnell exhibited a lack of judgment and insight. His responses were not altogether spontaneous. For example, Dr. McMeekin explained:

Dave also was rather interesting in that if you challenged some of his statements he would have to pause for a minute and become confused as to whether to blow up and overreact or maintain his congeniality. He did appear to want to maintain this and come across well and be accepted. Whenever something was said that would clash with his perceptions you could see that there was quite a debate going on about how he should react.

(*Id.*) Marnell overreacted as much in a positive direction as in a negative one, for example when Dr. McMeekin gave him a compliment. (*Id.*)

Dr. McMeekin administered a number of standardized tests. The WAIS–R test placed Marnell's intellectual functioning "in the solid Average range." (R. 413) He scored high in vocabulary, which Dr. McMeekin opined "would indicate even higher inate [sic] ability compared to someone who had completed high school and had a rather noneventful educational

experience." (*Id.*) He exhibited some signs of hyperactivity, which Dr. McMeekin indicated "could be a manifestation of minimal brain dysfunction." (*Id.*) Marnell's Wechsler Memory Scale testing placed his intellectual memory functions in the solid Average range, "without any appreciable areas of difficulties." (R. 414)

Dr. McMeekin concluded Marnell's "[c]urrent intellectual functioning is solid Average," and his "verbal and visual memory are average or stronger." (*Id.*) Marnell maintains his personal care adequately. He is inappropriate with his parents, but otherwise is cooperative and has a desire to please. He is moderately restricted in terms of social functioning, and moderately dysfunctional in terms of his ability to handle himself in employment situations. Dr. McMeekin opined Marnell would do well in "a kind of group home for younger adults where the employers know the employee has certain limitations and these will be worked on." (*Id.*) He exhibited an ability to make choices about his behavior, choosing whether to behave appropriately or inappropriately.

Dr. McMeekin diagnosed Marnell with attention deficit disorder with hyperactivity, manifested primarily in his "obstinacy, stubbornness, negativism, increased mood lability, low frustration tolerance, low self esteem, and lack of response to discipline." (R. 415) The doctor also diagnosed Marnell with paranoid traits. In Dr. McMeekin's opinion, Marnell would be able to manage benefit payments because he "has the cognitive skills to appreciate the idea of budgeting and rationing money out." (*Id.*) The doctor observed that because Marnell's "primary diagnosis does relate to problems with impulse control[,] follow up may be needed to see if he does handle his finances appropriately." (*Id.*)

Seven months later, Marnell was referred for a mental health evaluation to assess his readiness to enter a vocational rehabilitation program. He was seen at Burgess Mental Health in Onawa, Iowa, from February through August 1988. He was diagnosed initially with an adjustment disorder, not otherwise specified. He showed "significant signs of immaturity," blamed others for his problems, and showed little insight into his difficulties. He appeared genuinely interested in vocational/career training, and he checked into getting a GED, but did not follow up on it, stating he would have the opportunity to get his GED once he got into the voc-rehab program.

In a progress note dated April 18, 1988, the mental health director noted Marnell had been working for some local farmers, and he felt much better when he was working. His signs of immaturity seemed to be lessening. He worked sporadically through June 1988 (*see* R. 580–81), and made an effort to spend time with friends who did not drink. Marnell continued to show immaturity in his speaking throughout the time he was seen at the mental health center. Although he made some limited gains during therapy, he was only minimally cooperative. It appears Marnell may have become frustrated with the amount of time it was taking to get him into the voc-rehab program in Des Moines, and he eventually terminated his therapy after 19 sessions.

Psychiatrist James M. Duggan, D.O. performed a psychiatric evaluation of Marnell on January 27, 1993, at the request of DDS. He found Marnell to have no apparent signs of mental illness, paranoid traits, or attention deficit disorder with hyperactivity. Marnell's attention span was adequate, and he maintained good concentration and pace. His judgment was not grossly impaired, and he would be able to respond to some changes in the workplace. Dr. Duggan opined Marnell would be able to handle benefits on his own. (R. 431–32)

John F. Tedesco, Ph.D. performed a Psychiatric Review Technique of Marnell on February 9, 1993, based on his review of available records. He found that during the period from August 1985 to February 1993, Marnell had a personality disorder evidenced by paranoid traits, slight restriction of the activities of daily living, moderate difficulties in maintaining social functioning, and infrequent deficiencies of concentration, persistence or pace. (R. 368–75) In a related Individualized Functional Assessment for a Child from Age 16 to Attainment of Age 18, Dr. Tedesco found, for the same period of time, that Marnell had behavioral problems, some social skills deficits and adjustment problems, and some attention deficits and impulsivity that would affect his concentration, persistence and pace. (R. 376–78) He concluded that although some practitioners had observed Marnell as having some paranoid traits and social limitations, he was not "presently diagnosable," and he "did not appear to have a combination of mental impairments that was of comparable severity so as to disable an adult." (R. 359, 378; see R. 356–59)

On June 4, 1993, Janet S. McDonough, Ph.D. performed a similar Psychiatric Review Technique and Individualized Functional Assessment, in connection with the readjudication of Marnell's original April 1983 claim for benefits. From her review of available records,[11] Dr. McDonough found no evidence of impairment in Marnell's cognitive, communicative, or motor functioning. She noted Marnell could have had residuals of attention deficit hyperactivity disorder, but he was able to stay on task, although his work pace was somewhat slow. She concluded Marnell's "impairment did not substantially reduce his ability to function independently, appropriately, and effectively in an age-appropriate

manner. It was not comparable in severity to one that would disable an adult." (R. 389)

In July 1993, James Kinney, M.D. and P. Kiesser, Ph.D. reviewed the evaluations performed by Drs. Tedesco and McDonough, and concurred with their conclusions. (R. 400–05).

Marnell was examined by John V. Fernandez, M.D. on October 9, 1995, for purposes of a neuropsychiatric evaluation. Dr. Fernandez found Marnell to have no major psychiatric or neurological disorder. He diagnosed Marnell with schizotypal personality disorder, and assessed his current Global Assessment of Functioning (GAF) at 45, indicating "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed.1994). (See R. 866) Dr. Fernandez concluded Marnell has

> a serious personality disorder which has led to a lot of problems on the work site because of his lack of tact and his problems getting along with supervisors and with co-workers. He also tends to be a little odd and eccentric which adds to some of his problems. Neurologically he is basically normal. I do not see any reason why he cannot lift or carry any weight. He should be able to function in a normal eight-hour work day though he does have problems with seeing properly because of being blind in the right eye and decreased visual acuity in the left, and he is not taking his medicine for his glaucoma which is definitely going to impair vision in his left eye. His sensorium is clear, so, if benefit payments are

---

**11.** Dr. McDonough noted the original folder from Marnell's claim was not available, "and

there is no first-hand information from 1983." (R. 389)

given him, he should be able to manage them.

(R. 866–67)

On November 6, 1995, Marnell was referred by DDS to Goodwill Industries for an evaluation of his ability to perform basic job duties. He had difficulty sorting small plastic components according to a number stamped inside, and complained about his vision during the task. He completed 526 pieces, of which 132 were missorted. He performed better at placing warning stickers on cartons, making no errors, and performing at a 42% production rate compared to industry standards for that type of job. However, he took frequent breaks, complaining of eye strain and discomfort. The second day, he performed at a 40% production rate, but again took frequent breaks due to eye problems. The supervisor noted Marnell "would engage in conversations with other workers in the area during these extra break times and interfere with their work[.]" (R. 869)

On the third day, Marnell reported to work on time, but at 8:40 a.m., he reported he had a migraine headache and took a break. He returned at 9:45 a.m., when other workers returned from their morning break. At 10:00 a.m., he complained that his headache was not getting any better, and he called his father to pick him up. The Program Director for Vocational and Industrial Services at Goodwill summarized the conclusions from Marnell's evaluation as follows:

> It was the consensus of those involved in this evaluation that David did present a true representation of his ability to engage in routine work practices. Although his level of performance falls well short of that normally associated with competitive employment, it is felt that there is some employment potential for David. In order for him to reach his employment potential, a great deal of intervention would be required; e.g.,

Work Adjustment Training to help David learn the normal work behaviors that would be required by any employer, Job Coaching to provide intensive one-on-one training at the job site, a patient and supportive employer who would be willing to allow David the time necessary to learn proper work performance and behaviors, etc.

Other factors affecting his employability would appear to be: his inability to drive, thus limiting his access to employment opportunities[;] limited education and lack of training in a specific skill area[; and] lack of a support system that would advocate on his behalf with employers and others in the business community.

(R. 870)

On December 14, 1995, at the request of Marnell's attorney, vocational expert Lynne R. Easterday, M.Ed., of Heartland Rehabilitation Associates, performed an employability assessment of Marnell. The stated purposes of the assessment were:

> First, to assess whether Mr. Marnell's functional limitations as a child allowed him to develop and function as compared to other children of the same age. Secondly, to assess Mr. Marnell's ability to sustain employment on a full or part time basis, in consideration of his age, education, past relevant work/transferable skills, and physical and mental capacities.

(R. 877)

Marnell told Ms. Easterday he started drinking at age 13, "as an escape and to ignore his problems." (R. 882) He stated that when he lost his eye, it became harder for him to read and concentrate, and consequently he did not show up for school a lot or frequently showed up drunk. He "commented that he still does not value life the way a normal person does, and ... everyone is expendable. He voiced anger

and frustration that he could not join the military due to his loss of vision. He enjoys watching violent movies to see people get hurt. He also likes to watch auto racing, particularly when they crash, to see whether the driver walks away." (*Id.*) He became angry and belligerent at one point during the interview. (R. 883)

Ms. Easterday reviewed all the available records of Marnell's medical and school history. Among other things, she reviewed an affidavit from Marnell's school counselor, Cleo Gayl Hopkins, who noted Marnell had moderate to marked limitations in the areas of cognition, communication, social skills, responsiveness to stimuli, personal/behavioral skills, and concentration, persistence and pace. (*See* R. 885–86, 771–73) Ms. Easterday concluded that during Marnell's school age years, "he clearly had marked and/or moderate impairment in at least four pertinent domains of development," which prevented him from developing and functioning at a level comparable to other children his age. (R. 886)

She further concluded the following:

Based upon the records as a whole and in consideration of this gentleman's current age of 28 years, limited education of Ninth Grade, lack of any past relevant work, physical and mental limitations, the information contained in the records and statements made by Mr. Marnell during the clinical interview, it is the opinion of this vocational expert, within reasonable vocational certainty, that Mr. Marnell's medical and psychological conditions, collectively and cumulatively prevent him from working on a sustained basis, either full or part time, in any work as it is typically performed in the national economy.

Further, it is the opinion of this vocational expert, within reasonable vocational certainty, that there are no jobs which Mr. Marnell could ever have per-

formed on a sustained basis, either full or part time, that exist in significant numbers in his region or in several regions across the country.

Mr. Marnell has attempted to participate in the services of Vocational Rehabilitation, without success. Perhaps intense counseling, coupled with the recommendations of David Utely, Goodwill Industries, Inc., would improve his work behaviors to the extent that he could sustain employment in the future. It is the opinion of this vocational expert, within reasonable vocational certainty, that the prognosis for vocational improvement is very guarded and *intensive* counseling, work adjustment training, job coaching and an understanding employer would all be necessary in order ... for Mr. Marnell to be capable of sustaining employment.

(R. 886–87)

On August 5, 1996, Marnell was referred by DDS to Brian T. Fulton, D.O. for a psychiatric evaluation. Dr. Fulton noted Marnell's "general attitude was one of arrogance," "[h]is affect was rather haughty," and he "seemed very self righteous as he spoke of the general public having 'no moral standards.'" (R. 800–01) The doctor found Marnell to have impaired judgment and an absence of insight. (R. 801) He diagnosed Marnell with a "schizotypial [sic] personality disorder," found he was "unable to tolerate being around people," and assessed his GAF at 55, indicating moderate difficulty with social and occupational functioning.

Concerning Marnell's ability to function on the job, Dr. Fulton opined:

I don't believe that Mr. Marnell would have any problems remembering or understanding instructions or procedures or locations. Carrying out instructions is a different matter. He has a tendency

to feel that others are going to treat him poorly and carrying out instructions and maintaining attention and concentration would probably be affected by his fears. Interactions with supervisors, coworkers, and the public are unquestionably impaired and cause significant problems for him. He does not have good judgment and would likely misinterpret changes in the work place and respond inappropriately.

If he's found eligible for benefits, I would suggest that he start off with having some assistance managing his benefits. He may be able to take care of that by himself but that could be determined later.

(R. 801–02) On an accompanying Medical Statement of Ability to do Work–Related Activities (Mental), Dr. Fulton found Marnell would have a good ability to follow work rules and maintain his personal appearance. He would have a poor ability to relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, maintain attention or concentration; understand, remember and carry out complex, detailed but not complex, and simple job instructions; relate predictably in social situations; and demonstrate reliability. (R. 903–06)

On September 26, 1996, at the request of ALJ Burgess, vocational expert Sandra Trudeau reviewed the records of Marnell's visual analysis on April 23, 1996, and Dr. Fulton's report from the August 5, 1996, evaluation, and concluded "there would be no occupational base[ ] in which [Marnell] could work with these limitations." (R. 921)

### 6. Vocational expert's testimony

Vocational expert Sandra Trudeau (the "VE") testified at the third of Marnell's administrative hearings. After the VE and the ALJ briefly discussed Marnell's prior work history and employment evaluations, the ALJ asked the VE to assume the limitations set forth by Dr. Fernandez in his neuropsychiatric evaluation of October 9, 1995, and based on those limitations, to state whether there are jobs Marnell can perform that exist "in his region or facilities in the country." (R. 281) The VE responded Marnell "would be able to return to his cleaning job that he performed. With those limitations he would be able to perform work as an addresser, which is a sedentary and skilled job." (Id.) She explained an addresser places labels on mailings. She opined Marnell also would be able to work as a hospital cleaner or a garment sorter, both of which are classified as unskilled and light. (Id.)

However, based on the assessments from Goodwill and from Heartland Rehabilitation Associates, the VE opined Marnell cannot work. (R. 282) The VE noted Ms. Easterday recommended Marnell "would need a work adjustment program to learn appropriate work behaviors and ... a job coach in a one to one learning situation." (Id.) The VE concluded if those recommendations are true, Marnell would be unable to work in competitive employment. (Id.)

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. The Substantial Evidence Standard

Governing precedent in the Eighth Circuit requires this court to affirm the ALJ's findings if they are supported by substantial evidence in the record as a whole. *Krogmeier v. Barnhart,* 294 F.3d 1019, 1022 (8th Cir.2002) (citing *Prosch v. Apfel,* 201 F.3d 1010, 1012 (8th Cir.2000)); *Weiler, supra,* 179 F.3d at 1109 (citing *Pierce v. Apfel,* 173 F.3d 704, 706 (8th Cir.1999)); *Kelley, supra,* 133 F.3d at 587 (citing *Mat-*

*thews v. Bowen,* 879 F.2d 422, 423–24 (8th Cir.1989)); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...."). Under this standard, "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier, id.; Weiler, id.;* accord *Gowell v. Apfel,* 242 F.3d 793, 796 .(8th Cir.2001) (citing *Craig v. Apfel,* 212 F.3d 433, 436 (8th Cir.2000)); *Hutton v. Apfel,* 175 F.3d 651, 654 (8th Cir.1999); *Woolf v. Shalala,* 3 F.3d 1210, 1213 (8th Cir.1993).

■ Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier,* 294 F.3d at 1022 (citing *Craig,* 212 F.3d at 436); *Wilcutts v. Apfel,* 143 F.3d 1134, 1136 (8th Cir.1998) (quoting *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)); *Gowell, id.; Hutton,* 175 F.3d at 654 (citing *Woolf,* 3 F.3d at 1213); *Kelley,* 133 F.3d at 587 (citing *Cline v. Sullivan,* 939 F.2d 560, 564 (8th Cir.1991)).

■ In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.,* 879 F.2d 441, 444 (8th Cir.1989) (citing *Steadman v. S.E.C.,* 450 U.S. 91, 99, 101 S.Ct. 999, 1006, 67 L.Ed.2d 69 (1981)). The court, however, does "not reweigh the evidence or review the factual record *de novo.*" *Roe v. Chater,* 92 F.3d 672, 675 (8th Cir.1996) (quoting *Naber v. Shalala,* 22 F.3d 186, 188 (8th Cir.1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those

positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan,* 956 F.2d 836, 838 (8th Cir.1992), and citing *Cruse v. Bowen,* 867 F.2d 1183, 1184 (8th Cir.1989)); *see Hall v. Chater,* 109 F.3d 1255, 1258 (8th Cir.1997) (citing *Roe v. Chater,* 92 F.3d 672, 675 (8th Cir. 1996)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala,* 30 F.3d 934, 939 (8th Cir.1994) (citing *Browning v. Sullivan,* 958 F.2d 817, 822 (8th Cir.1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf,* 3 F.3d at 1213). The court may not reverse "the Commissioner's decision merely because of the existence of substantial evidence supporting a different outcome." *Spradling v. Chater,* 126 F.3d 1072, 1074 (8th Cir.1997); *accord Pearsall,* 274 F.3d at 1217; *Gowell, supra.*

■ On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir.1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir.1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir.1987), *cert. denied,* 484 U.S. 1075, 108 S.Ct. 1050, 98 L.Ed.2d 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir.1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir.1994); *see also Bishop v. Sullivan,* 900 F.2d

1259, 1262 (8th Cir.1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1) the claimant's daily activities;
> 2) the duration, frequency and intensity of the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects of medication;
> 5) functional restrictions.

*Polaski,* 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart,* 292 F.3d 576, 580–81 (8th Cir.2002).

### B. Disability Determination

#### 1. Child claimants

To qualify for SSI, a claimant must be "disabled" as defined by the Social Security Act. 42 U.S.C. § 423(a)(1)(D). Before 1996, the following test was applied to a child seeking SSI benefits:

> A four-part test requires the ALJ to inquire into: (1) whether the child was currently engaged in substantial gainful activity; (2) whether the child suffered severe impairments or a combination of severe impairments; (3) whether the child's impairments met or equaled any listed impairment; and (4) if no listed impairment is met, the child may still be found disabled if the child's physical or mental impairments so limited his ability to function independently in an age-appropriate manner that they are "of comparable severity" to those that disable adults. 20 C.F.R. § 416.924(b)-(f) (1995).

*Rucker v. Apfel,* 141 F.3d 1256, 1259 (8th Cir.1998).

In 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("1996 Act"), which redefined the eligibility standard for children under the SSI disability determination process. This legislation eliminated "comparable severity," the fourth standard formerly used in the evaluation of a child's SSI claim, and instructed the Commissioner to discontinue the use of the individualized functional assessment of children formerly set forth in 20 C.F.R. §§ 416.924(d) and 416.924(e). Pub.L. No. 104–193, § 211(b)(2). Instead, the 1996 Act imposed "a more stringent standard for evaluating childhood disability claims." *Rucker,* 141 F.3d 1256, 1259 (citing *Briggs v. Callahan,* 139 F.3d 606, 608–09 (8th Cir. 1998), and *Nelson v. Apfel,* 131 F.3d 1228, 1234 (7th Cir.1997)); *Bryant v. Apfel,* 141 F.3d 1249, 1251 (8th Cir.1998). The Act now requires a child seeking SSI benefits to prove the following:

> An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, *which results in marked and severe functional limitations,* and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i) (emphasis added).

The 1996 Act applies to all child disability applicants who filed claims on or after August 22, 1996, or whose cases were not finally adjudicated before August 22, 1996. *See* 42 U.S.C.A. § 1382c, Historical and Statutory Notes, Effective and Applicability Provisions, 1996 Acts (West Supp.2002) (quoting Pub.L. 104–193 § 211(d)(1)(A)(i)). A claim is not considered to have been

finally adjudicated if "there is pending a request for either administrative or judicial review with respect to such claim that has been denied in whole." *Id.* (quoting Pub.L. 104–193 § 211(d)(1)(A)(ii)). The 1996 Act applies to Marnell's application for SSI benefits as a child. *See Rucker,* 141 F.3d 1256, 1259; *Briggs,* 139 F.3d 606, 608–09.

The Commissioner enacted regulations that implemented these changes. Under these regulations, the Commissioner engages in a three-step analysis to determine whether a child qualifies for disability benefits. 20 C.F.R. § 416.924(a) (2003).[12] First, the Commissioner determines whether a child is engaged in "substantial gainful activity." 20 C.F.R. § 416.924(a) & (b). If so, then the Commissioner will determine the child is not disabled and deny the claim. *Id.* If the child is not engaged in substantial gainful activity, then the Commissioner will determine whether the child's impairment, or combination of impairments, is "severe," meaning the impairment causes more than minimal functional limitations. 20 C.F.R. § 416.924(a) & (c). If the impairment is not severe, then the child is not disabled and the claim is denied. *Id.* If the impairment is severe, then the Commissioner looks to see whether the impairment meets, medically equals, or functionally equals, an impairment listed in the Regulations, and whether the impairment has lasted or is expected to last for a continuous period of at least 12 months. 20 C.F.R. § 416.924(a) & (d); 42 U.S.C.

§ 1382c(a)(3)(C)(i). To be "functionally equivalent," the child's limitations must be at least equal in severity and duration to limitations associated with a listed impairment. 20 C.F.R. § 416.926.[13]

The "functionally equivalent" analysis requires the Commissioner to analyze the following six "domains," which are "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1) (2003). The six domains are: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for [one]self; and, (vi) Health and physical well-being." *Id.*

The regulations explain that among other things, in evaluating a claimant's ability to function in each of these domains, the Commissioner will seek information to help answer the following questions about whether the claimant's activities are typical of other children the claimant's age who do not have impairments:

(1) What activities can the claimant perform?

(2) What activities is the claimant unable to perform?

(3) Which of the claimant's activities are limited or restricted compared to other children the claimant's age who do not have impairments?

(4) Where does the claimant have difficulty with his/her activities—at home, in child care, at school, or in the community?

---

12. All subsequent regulatory citations in this opinion are to the 2003 Code of Federal Regulations.

13. Notably, the "functional equivalence" analysis changed while Marnell's application was pending. For an excellent and detailed summary of the changes resulting from the interim and final rules relating to the "functional equivalence" determination, as well as

an explanation of which set of rules applies in particular cases, *see Kittles v. Barnhart,* 245 F.Supp.2d 479 (E.D.N.Y.2003). In the present case, because the ALJ's decision became final on February 22, 2002, upon the Appeals Council's denial of Marnell's request for review, the amended "final rules" are applicable to his claim for benefits. *See id.* at 489–90.

(5) Does the claimant have difficulty independently initiating, sustaining, or completing activities?

(6) What kind of help does the claimant need to do his/her activities, how much help is needed, and how often is the help needed?

20 C.F.R. § 416.926a(b)(2)(i)-(vi).

A finding of functional equivalence will be made only if a child has "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a) (2003). A "marked" limitation in a domain means the claimant's impairment interferes seriously with his/her ability to independently initiate, sustain or complete activities. This may mean serious limitation exists in only one activity, "or when the interactive and cumulative effects of [the] impairment(s) limit several activities." 20 C.F.R. § 416.926a(e)(2)(i). A marked limitation also may mean "a limitation that is more than moderate' but 'less than extreme.'" *Id.* The regulations point to standardized testing results as an indicator of whether a limitation is "marked," and contain other age-based criteria. *See id.*

An "extreme" limitation is the rating given to the "worst limitations," and occurs in a domain when a claimant's impairment interferes "very seriously" with his/her ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation is "more than marked," but "does not necessarily mean a total lack or loss of ability to function." *Id.* Again, the regulations point to standardized testing scores and certain age-based criteria as indicators of whether a limitation is "extreme." *See id.*

The regulations provide detailed descriptions of the types of information that is relevant to consideration of each of the domains. *See* 20 C.F.R. § 416.926a(*g*)-(*l*). The ultimate "responsibility for deciding functional equivalence rests with the Administrative Law Judge or Appeals Council." 20 C.F.R. § 416.926a(n).

## 2. *Adult claimants*

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. An adult claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists ... in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Kelley v. Callahan*, 133 F.3d 583, 587–88 (8th Cir.1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir.1997)). First, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity. Second, he looks to see whether the claimant labors under a severe impairment; *i.e.,* "one that significantly limits the claimant's physical or mental ability to perform basic work activities." *Kelley*, 133 F.3d at 587–88. Third, if the claimant does have such an impairment, then the Commissioner must decide whether this impairment meets or equals one of the presumptively disabling impairments listed in the regulations. If the impairment does qualify as a presump-

tively disabling one, then the claimant is considered disabled, regardless of age, education, or work experience. Fourth, the Commissioner must examine whether the claimant retains the residual functional capacity to perform past relevant work.

Finally, if the claimant demonstrates the inability to perform past relevant work, then the burden shifts to the Commissioner to prove there are other jobs in the national economy that the claimant can perform, given the claimant's impairments and vocational factors such as age, education and work experience. *Id.; accord Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir.2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel,* 160 F.3d 1203, 1206 (8th Cir.1998)).

Step five requires that the Commissioner bear the burden on two particular matters:

> In our circuit it is well settled law that once a claimant demonstrates that he or she is unable to do past relevant work, the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do. *McCoy v. Schweiker,* 683 F.2d 1138, 1146–47 (8th Cir.1982) (*en banc*); *O'Leary v. Schweiker,* 710 F.2d 1334, 1338 (8th Cir.1983).

*Nevland v. Apfel,* 204 F.3d 853, 857 (8th Cir.2000) (emphasis added); *accord Weiler v. Apfel,* 179 F.3d 1107, 1110 (8th Cir.1999) (analyzing the fifth-step determination in terms of (1) whether there was sufficient medical evidence to support the ALJ's residual functional capacity determination and (2) whether there was sufficient evidence to support the ALJ's conclusion that there were a significant number of jobs in the economy that the claimant could perform with that residual functional capacity); *Fenton v. Apfel,* 149 F.3d 907, 910 (8th Cir.1998) (describing "the Secretary's two-fold burden" at step five to be, first, to prove the claimant has the residual functional capacity to do other kinds of work, and second, to demonstrate that jobs are available in the national economy that are realistically suited to the claimant's qualifications and capabilities).

## IV. ANALYSIS

### A. Applications for Benefits Under Title XVI

The first pending applications for consideration by the court are Marnell's application for benefits as a disabled child and a disabled adult under Title XVI of the Social Security Act. The ALJ dealt separately with Marnell's allegations of impairment as a child and as an adult, and the court will discuss those issues separately, as well.

### 1. Application for SSI benefits as a child

In connection with Marnell's application for benefits as a disabled child, the ALJ found Marnell had not engaged in substantial gainful activity prior to age 18. (R. 74, ¶ 2) He found Marnell's right eye blindness constituted a severe, medically determinable impairment, but the impairment did not meet, medically equal, or functionally equal the listings. (R. 74, ¶¶ 3, 5 & 6) He found Marnell "did not have a medically determinable physical or mental impairment, or combination of impairments, which resulted in marked and severe functional limitations," and was not under a disability prior to age 18. (R. 75, ¶¶ 8 & 9) He concluded Marnell was not entitled to SSI benefits as a child. (R. 76)

In considering this application, the ALJ noted, "Maladaptive behaviors; that is, behaviors destructive to self, others, animals, or property, requiring protective intervention are no longer considered under childhood listing 112.02B2c(2)." (R. 52–53) The ALJ recognized the factors discussed previously in this opinion which the regulations require to be considered in a child's disability evaluation. (R. 53, citing 20 C.F.R. §§ 416.924a–416.924c)

In evaluating the evidence, the ALJ noted Marnell's vision in his left eye prior to age 18 "was well within normal limits with appropriate glasses." (R. 61) He found no other physical limitations were present. In particular, Marnell's dizziness and "black outs" were not severe or frequent enough to be disabling. (See R. 61–62)

On the issue of Marnell's mental health, the ALJ relied heavily on the fact that despite the concerns of Marnell's teachers, parents, and school counselor, Marnell was never referred for mental health treatment. The ALJ concluded, "If [Marnell's] symptomatology was of disabling proportions, referral for psychiatric treatment would be expected for [Marnell's] well being as well as for the safety and best interests of other students and faculty." (R. 62)

Marnell argues that because the records from his childhood claim have been lost, it is appropriate to rely on retrospective evaluations based on the available records. He urges the court to rely on the evaluation by VE Easterday, an expert used frequently by the Social Security Administration, and find Marnell was disabled as a child.

On the issue of whether Marnell was physically disabled, the court finds the Record amply supports the Commissioner's decision. There is no evidence of record to suggest Marnell's vision deficiencies impaired him to the extent necessary for a finding of disability. On the issue of Marnell's childhood mental disability, this case presents the type of situation discussed by the Eighth Circuit in *Roe v. Chater, supra.* The court is not allowed to reweigh the evidence and the Record *de novo.* The evidence of record supports two inconsistent positions—one that Marnell's apparent personality disorder was disabling, and the other that it was not. In such a case, the court is bound to affirm the Commissioner's decision. *See Roe,* 92 F.3d at 675; *Spradling,* 126 F.3d at 1074; *Pearsall,* 274 F.3d at 1217; *Culbertson,* 30 F.3d at 939.

It is, as Marnell notes, highly troubling that the Administration has lost records vital to a determination of his case. It is perhaps even more troubling that it took the ALJ two years after the third hearing to issue decisions on Marnell's applications, and it took the Appeals Council another four years to issue a final ruling. Nevertheless, although the court "might have weighed the evidence differently," the court finds substantial evidence exists to support the Commissioner's conclusion that Marnell was not disabled as a child, and is not entitled to SSI benefits in connection with his application for benefits as a disabled child under Title XVI. *Id.*

## 2. Application for SSI benefits as an adult

Regarding Marnell's application for benefits as a disabled adult, the ALJ found Marnell was not engaged in substantial gainful activity and had no past relevant work. (R. 74, ¶ 2; R. 75, ¶ 10) His right eye blindness and glaucoma, and his schizotypal personality disorder, constitute "severe" impairments "because they impose more than slight limitations on his ability to function." (R. 69; R. 75, ¶ 11) However, the ALJ found Marnell's impairments did not meet or equal a listed impairment. (R. 75, ¶ 6) The ALJ then considered whether jobs exist in the national

economy that Marnell could perform. He noted Marnell would be required "to avoid working at unprotected heights or around moving machinery, and he would be unable to do work requiring visual acuity and peripheral vision." (*Id.*) However, the ALJ did not address how Marnell's personality disorder would limit his ability to function. (*See id.*) The ALJ found Marnell could work at light, unskilled jobs such as an addresser, garment sorter, and hospital cleaner. (*Id.*, ¶ 12) The ALJ further found Marnell's subjective complaints, his parents' testimony, and the affidavit of his school counselor, all "were not credible and, therefore, not entitled to significant weight and consideration." (R. 75, ¶ 7) The ALJ found alcohol and other drugs were not contributing factors to a finding of disability, and concluded Marnell was not entitled to SSI benefits under Title XVI as an adult. (R. 76)

The ALJ noted Marnell "has not contended that his medically determinable impairments meet or equal the 'listings', and the record contains no evidence which would support such finding." (R. 70) Marnell points out that in a letter from his attorney to the ALJ dated September 10, 1996, his attorney argued Marnell "clearly meets the requirements of Listing 12.08," and enclosed copies of relevant regulations and other documents with the letter. (R. 912; *see* Doc. No. 12, p. 42)

The ALJ did not justify his conclusory finding that the Record contains no evidence Marnell's condition meets the listings, and he proceeded directly to the final step of the evaluation process, considering whether jobs exist that Marnell could perform.[14] Ordinarily, when the ALJ ignores

a step in the sequential evaluation process, the court will remand the case for further consideration. In the present case, however, the Commissioner has already delayed this matter far beyond what is reasonable or acceptable. Therefore, the court will undertake an analysis of whether Marnell's impairment meets the criteria for Listing 12.08, as part of the court's evaluation of whether substantial evidence exists to support the ALJ's finding that Marnell is not disabled.

The regulations governing personality disorders provide as follows:

12.08 Personality Disorders: A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Deeply ingrained, maladaptive patterns of behavior associated with one of the following:

1. Seclusiveness or autistic thinking; or

2. Pathologically inappropriate suspiciousness or hostility; or

3. Oddities of thought, perception, speech and behavior; or

4. Persistent disturbances of mood or affect; or

5. Pathological dependence, passivity, or aggressivity; or

---

14. Despite his assertion that the listings are inapplicable here, the ALJ recognized the applicability of Listing 12.08 in the OHA Psychiatric Review Technique Form completed concurrently with the ALJ's decision. (*See* R. 77–79) The ALJ checked "absent" for all criteria of a personality disorder, with the exception of the box marked "Other," next to which the ALJ entered "adjustment disorder." (R. 78) Therefore, the court is at a loss to explain why the ALJ failed to discuss the listing in his opinion.

6. Intense and unstable interpersonal relationships and impulsive and damaging behavior;

And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing of Impairments 12.08. Thus, in order for Marnell to suffer complete disability entitling him to social security benefits, he must meet one of the "A" criteria and two of the "B" criteria.

In considering whether Marnell meets these criteria, the opinions of mental health professionals and vocational experts who actually examined Marnell—Drs. McMeekin, Duggan, Fernandez, and Fulton; employment counselors at Goodwill Industries; and VE Easterday—are, in most cases, afforded greater weight than those of professionals who merely reviewed available records—Drs. Tedesco, McDonough, Kinney and Kiesser, and VE Trudeau. *Cf. Prosch v. Apfel,* 201 F.3d 1010, 1012–13 (8th Cir.2000); *accord Wiekamp v. Apfel,* 116 F.Supp.2d 1056, 1063–64 (N.D.Iowa 2000) (Bennett, C.J.).

The professionals who examined Marnell reached the following conclusions specifically related to the criteria set forth in listing 12.08. When Dr. McMeekin examined Marnell in July 1987, he noted Marnell was boastful, pretentious, disrespectful, overreactive, loud, angry, and grandiose, and repeatedly raised his voice almost to the point of yelling. Dr. McMeekin opined Marnell's primary difficulties in the area of social skills appeared to be "anger, hostility, and a very low threshold for reactivity." (R. 410) The standardized tests administered to Marnell indicated his intellectual functioning was average, and his verbal and visual memory was average or stronger. Dr. McMeekin found Marnell was moderately restricted in terms of both social functioning and his ability to handle himself in employment situations. The doctor diagnosed Marnell with attention deficit disorder with hyperactivity, manifested in his "obstinacy, stubbornness, negativism, increased mood lability, low frustration tolerance, low self esteem, and lack of response to discipline."

Marnell's evaluation at Burgess Mental Health in February 1988, resulted in a diagnosis of adjustment disorder, NOS. He showed "significant signs of immaturity," blamed others for his problems, and showed little insight into his difficulties. He made some limited gains during therapy, but was only minimally cooperative throughout.

In Dr. Duggan's psychiatric evaluation of Marnell in January 1993, the doctor found Marnell to have no apparent signs of mental illness, paranoid traits, or attention deficit disorder with hyperactivity. Marnell's attention span was adequate, he maintained good concentration and pace, his judgment was not grossly impaired, and the doctor opined he would be able to respond to "some changes in his work place."

Dr. Fernandez performed a neuropsychiatric evaluation of Marnell in October 1995. He found Marnell to have no major psychiatric or neurological disorder. However, he diagnosed Marnell with schizotypal personality disorder, and assessed his GAF at 45, indicating a serious impairment in social, occupational, or school functioning. Dr. Fernandez found Marnell to have "a serious personality disorder," and "to be a little odd and eccentric." He neverthe-

less opined Marnell "should be able to function in a normal eight-hour work day," with appropriate restrictions related to his impaired vision.

Marnell was evaluated by Goodwill Industries in November 1995, for his ability to perform basic job duties. The evaluators concluded Marnell had presented a true representation of his ability to engage in routine work practices. He evidenced an ability to work at one type of job at a 42% production rate compared to the industry standard. The evaluators noted that for Marnell to be employable, he would need "a great deal of intervention," including one-on-one intensive coaching, and "a patient and supportive employer."

In December 1995, VE Easterday found Marnell would be unable to work on a sustained basis at any type of job as it is typically performed in the national economy. She noted Marnell's prognosis for vocational improvement is "very guarded" and it would require "*intensive* counseling, work adjustment training, job coaching and an understanding employer in order ... for Mr. Marnell to be capable of sustaining employment."

In August 1996, Dr. Fulton performed a psychiatric evaluation of Marnell, and found him to be arrogant, haughty, and self-righteous, with impaired judgment and an absence of insight. He diagnosed Marnell with a schizotypal personality disorder, found he was "unable to tolerate being around people," and assessed his GAF at 55, indicating moderate difficulty with social and occupational functioning. Dr. Fulton opined that although Marnell could remember and understand instructions, procedures and locations, he would have difficulty carrying out instructions, and likely would respond inappropriately to changes in the work place. He found Marnell would have a poor ability to relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with

work stresses, function independently, maintain attention or concentration; understand, remember and carry out complex, detailed but not complex, and simple job instructions; relate predictably in social situations; and demonstrate reliability.

Lastly, VE Trudeau, the expert under contract with the Administration in this case, found that with the limitations described by Dr. Fernandez in 1995, Marnell would be able to work as a hospital cleaner, garment sorter, or addresser. However, considering the assessments from Goodwill and VE Easterday, Marnell would be unable to work in competitive employment. Similarly, after reviewing Dr. Fulton's report from August 1996, VE Trudeau concluded "there would be no occupational base[ ] in which [Marnell] could work with these limitations."

The ALJ "adopted the opinions of Drs. Fernandez and Duggan," concluding Marnell "has volitional control over his behavior and simply chooses not to work." (R. 73) The ALJ failed to discuss Dr. Fulton's conclusions at all, and failed to provide reasons for discounting the opinions of VE Easterday and the Goodwill evaluators, as well as VE Trudeau's opinion after she reviewed Dr. Fulton's report. The ALJ's reliance on Dr. Duggan's opinion is particularly curious, given that Dr. Duggan's conclusions are so divergent from all other professionals who have evaluated Marnell. The court finds the ALJ's failure to substantiate his conclusions adequately constitutes error.

█ The court finds the clear weight of the evidence supports a finding that Marnell meets the requirements of Listing 12.08, and is disabled due to a personality disorder. The Record indicates that throughout Marnell's adult life, he has exhibited anger, hostility, and an inability to engage in appropriate relationships. The court finds Marnell's "personality traits

are inflexible and maladaptive and cause . . . significant impairment in social [and] occupational functioning." He has exhibited not just one, but three of the criteria set forth in listing 12.08(A), including "[p]athologically inappropriate suspiciousness or hostility"; "[o]ddities of thought, perception, . . . and behavior"; and "[i]ntense and unstable interpersonal relationships and impulsive and damaging behavior." The evidence indicates these "[d]eeply ingrained, maladaptive patterns of behavior" have resulted in Marnell having "[m]arked difficulties in maintaining social functioning," and "[m]arked difficulties in maintaining concentration, persistence, or pace," satisfying two of the criteria set forth in listing 12.08(B).

Because the ALJ failed to address the applicability of the listings, and the court has found substantial evidence exists to conclude that as an adult, Marnell meets the criteria of Listing 12.08, the court therefore concludes the Record does not contain substantial evidence to support the ALJ's decision denying Marnell's adult claim for SSI benefits under Title XVI.[15]

Further, the court specifically finds Marnell's disability began when he attained the age of 18, and not before. Thus, Marnell was not under a disability "at the time" he attained the age of 18, but he has been under a disability continuously thereafter. This finding will be significant in addressing Marnell's claim for child's disability insurance benefits, discussed *infra.*

Having found Marnell is fully disabled, the court does not need to address Marnell's arguments that the ALJ failed to present an accurate hypothetical to the VE, and failed to substantiate his credibility findings.

### B. Application for DI Benefits Under Title II

The next application before the court is Marnell's September 21, 1992, application for DI benefits under Title II of the Social Security Act. The ALJ issued a separate administrative opinion relating to this application. (R. 83–104) The ALJ found Marnell met the Title II special earnings requirements, first becoming insured on April 1, 1992, and continuing through June 30, 1993. (R. 102, ¶ 1) Pursuant to the five-step evaluation process discussed above, the ALJ found Marnell has not performed substantial gainful work activity since April 1, 1992. (R. 92; R. 102, ¶ 2) He next found Marnell suffers from severe impairments including glaucoma and blindness of the right eye, and an "adjustment disorder," but those impairments, either singly or collectively, did not meet or equal the listings. (R. 102, ¶¶ 3 & 4) The ALJ found Marnell had no past relevant work, and considering his limitations, he would be able to work as an addresser and a hospital cleaner. (R. 102, ¶ 5; R. 103, ¶¶ 6 & 9)

As in the case of Marnell's applications for benefits under Title XVI, here, the ALJ concluded Marnell's "right eye blindness and glaucoma and adjustment disorder would have imposed limitations upon his ability to function" (R. 103, ¶ 8), but then the ALJ only addressed Marnell's physical limitations with regard to work, noting Marnell "would have had to avoid working at unprotected heights or around moving machinery and he would have been

---

15. One additional issue deserves brief mention here. In his OHA Psychiatric Review Technique Form, the ALJ indicated Marnell's schizotypal personality disorder was "associated with the regular use of substances that affect the central nervous system," under List-ing 12.09. (*See* R. 78) However, the ALJ specifically found that "Drugs or Alcohol are not a contributing factor material to a finding of disability in this case." (R. 76, ¶ 13). The court concurs in this finding by the ALJ.

unable to do work requiring acute visual acuity." (*Id.*) The ALJ failed to address how Marnell's "adjustment disorder" would limit his ability to function in the work place. (*See id.*) The ALJ concluded Marnell was not disabled from April 1, 1992, to June 30, 1993, and therefore is not entitled to DI benefits for that period. (R. 103, ¶ 10)

■ In this case, the criteria for determining whether Marnell is disabled for purposes of his application for DI benefits under Title II are identical to the criteria applicable to his application for SSI benefits under Title XVI. *Compare* 42 U.S.C. § 1382c(a)(3) *with* 42 U.S.C. § 423(d); *cf. Zebley, supra,* 493 U.S. at 526 n. 3, 110 S.Ct. at 889 n. 3. Because the court has found Marnell has been disabled throughout his adult life for purposes of his Title XVI claim, the court need not revisit the issue here. The court finds Marnell similarly is disabled for purposes of his Title II claim, and finds the Record does not contain substantial evidence to support the Commissioner's decision on this claim.

### C. Application for Child's Insurance Benefits

The last issue before the court for review is the ALJ's decision that Marnell is not entitled to child's disability insurance benefits under Title II. (*See* R. 21–44) For Marnell to be entitled to child's disability insurance benefits, he must meet several criteria, as set forth in 42 U.S.C. § 402(d). First, he must be a child of an individual entitled to old-age or disability insurance benefits. At the time of Marnell's application in September 1992, his father was fully insured and was receiving Social Security disability insurance benefits.[16] Second, Marnell must have filed an application. That the court is considering an administrative denial of benefits is *ipso facto* evidence that he meets this criterion.

Third, at the time the application was filed, he had to be unmarried, and, for purposes of this case, "under a disability . . . which began before he attained the age of 22." *See* 42 U.S.C. § 402(d)(1)(B). Marnell filed his application on September 21, 1992, when he was twenty-five years old. He was unmarried at the time. The court has found previously that Marnell became disabled when he turned 18 years old, and not before. Thus, Marnell satisfies this criterion. *See, e.g., Smolen v. Chater,* 80 F.3d 1273, 1280 (9th Cir.1996) ("claimant must be disabled *continuously and without interruption*" beginning before 22nd birthday until time he applies for child's DI benefits) (citing *Suarez v. Sec'y of Health & Human Servs.,* 755 F.2d 1, 3 (1st Cir.1985) (subsequent history omitted); *Reading v. Mathews,* 542 F.2d 993, 997 (7th Cir.1976); *Futernick v. Richardson,* 484 F.2d 647, 648 (6th Cir.1973); *Reyes v. Sec'y of H.E.W.,* 476 F.2d 910, 914 (D.C.Cir.1973)). Fourth, Marnell must have been dependent upon his father at the time his application was filed. The ALJ so found (R. 43, ¶ 3), and the court concurs in that finding.

■ Having satisfied these criteria, Marnell "shall be entitled to a child's insurance benefit[.]" 42 U.S.C. § 402(d)(1). Pursuant to the statute, Marnell is entitled to benefits beginning with the month following his 18th birthday, and ending with the occurrence of one of the triggering events set forth in the statute. *See id.*

### V. CONCLUSION

For the reasons discussed above, the court *affirms* the ALJ's denial of Marnell's

---

16. Mr. Marnell testified he received Social Security disability insurance benefits until he turned 55, on March 17, 1996, at which time he began receiving Social Security "retirement" benefits. (R. 252–53)

claim for SSI benefits under Title XVI as a disabled child, and *reverses* the ALJ's denial of Marnell's claims for SSI benefits under Title XVI as a disabled adult, DI benefits as a disabled adult, and child's disability insurance benefits. Accordingly, this case is *remanded* to the Commissioner for the purpose of calculating and awarding benefits consistent with this opinion.

**IT IS SO ORDERED**.