333 F.Supp.2d 846 (2004)
Arlena TAYLOR o/b/o Terrance McKINNIES Plaintiff,
v.
Jo Anne B. BARNHART Commissioner of Social Security, Defendant.
No. 4:03 CV 1370 DDN.
United States District Court, E.D. Missouri, Eastern Division.
August 13, 2004.
*847 Franklin A. Williams, Brown and Crouppen, St. Louis, MO, for Plaintiff.
Joseph B. Moore, Raymond W. Gruender, III, Office of U.S. Attorney, St. Louis, MO, for Defendant.

*848 MEMORANDUM

NOCE, United States Magistrate Judge.
This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying plaintiff's application for child's supplemental security income (SSI) benefits based on disability under Title XVI of the Social Security Act (Act), 42 U.S.C. §§ 1381, et seq. The parties have consented to the exercise of plenary jurisdiction by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

I. BACKGROUND
A. Plaintiff's Application and Terrance's School Records
In March 2002, Arlena Taylor applied for benefits on behalf of her son, Terrance McKinnies, who was born in January 1987. She asserted that he has been disabled since September 21, 2001 because he has the "mind of a 6 year old." (Tr. 40, 48.)
In early 2001, after individual intervention strategies implemented in the regular classroom failed, Terrance underwent testing and evaluation for an Individual Education Program (IEP). At the time of the evaluation, he was in the eighth grade. His mother noted these behavioral problems at home: temper outbursts, hitting and fighting, disobeying rules, lying, stealing, difficulty expressing himself, overactivity, and impulsiveness. (Tr. 69-117.)
The IEP evaluation revealed that Terrance's cognitive testing was below average. Based on an average standard age score (SAS) of 100, his verbal SAS was 83, his quantitative SAS was 72, and his nonverbal SAS was 79. His adaptive behavior placed him at an age equivalent to 7 years and 5 months (54 SAS), which was below his cognitive functioning. His teachers and counselors noted daily behavioral deficits which they considered moderate to severe. The behavioral problems considered severe were as follows: easily distracted, short attention span, reluctant to begin tasks, gives up easily, does not complete tasks, difficulty organizing or appropriately using time, performs work carelessly, needs directions repeated, works slowly, requires additional time, difficulty working independently and making transitions, exhibits attention seeking behavior, acts impulsively, appears apathetic and unmotivated, overly dependent, and lacks self-confidence. (Tr. 97-99, 105-06.)
Behaviors such as the abuse of school property, tardiness, making disturbing noises, physical or verbal aggression, use of obscene language, responding inappropriately to comments of others, or engaging in self-destructive behavior were not documented over an extended period of time. (Tr. 106.)
The examiner recommended a highly structured classroom where Terrance could receive immediate feedback and self-correcting materials to help develop appropriate work habits. The examiner added that Terrance required a small group instructional setting to acquire needed academic and behavioral skills. Multiple accommodations and modifications were required, such as simplifying directions, extending time, and providing supplementary materials. (Tr. 73-74, 111.)
Terrance's classroom teachers estimated that he functioned in specific subjects at the third grade level in reading, spelling, and written language, and at the fifth grade level in arithmetic. His formal achievement tests showed that he performed at the following levels: basic reading skills  ending fourth grade; reading comprehension  ending second grade; mathematical reasoning  ending third grade; written expression  beginning fifth grade. His overall level of functioning was within the low average range with no significant *849 difference between his verbal and performance scales. His adaptive functioning was below his cognitive functioning. (Tr. 71, 110.)
From a social/emotional/behavioral standpoint, Terrance's teachers observed that he exhibited attention seeking behavior, socialized at inappropriate times, left his seat without permission, and was easily influenced by his peers. His gross and fine motor skills were adequate for school functioning. His overall speech and language skills were considered commensurate with his cognitive functioning. (Tr. 71-72.)
Terrance's teachers stated that he was punctual and maintained good relationships with peers and authority figures. He received unsatisfactory ratings in following school/class rules, working independently, being prepared, requesting help, remaining on task, completing work on time, producing quality work, and possessing self-confidence. His attendance was poor and he had received one in-school suspension at the time of the IEP evaluation. However, his disruptive behavior was considered "manageable." (Tr. 88.)
Upon evaluation, Terrance was diagnosed as learning disabled. It was determined that he should attend 400 minutes of resource/special education classes per week. (Tr. 69, 91.)
In a May 13, 2002 teacher questionnaire, Terrance's art teacher reported that Terrance was usually ahead of the other children in class work, finished work on time, followed directions, was alert, and was intelligent. She did not observe problems with concentration or following directions. She stated that he needed extra supervision around tools and supplies and that other students tended to shy away from him, although he was always respectful towards her. Further, she observed that he was easily "conned" by his peers to do something wrong and got into trouble about once per month. His attendance was good when he was not suspended. (Tr. 64-66.)
Terrance's ninth-grade report card included a first semester grade point average (GPA) of 0.86 (out of a possible 4.0). His third quarter grades were even worse, with a D in pre-algebra, and Fs in reading, physical education, contemporary issues, history, and earth science. B grades in art were his best grades that school year. (Tr. 67.)
B. Terrance's Medical Records
In November 2000, Terrance started psychiatric care at Hopewell Center, with an initial Global Assessment of Functioning (GAF) of 35. He was brought in because he had been stealing, acting up in school, fighting, and showing disrespect to authority. He admitted hearing voices when stealing. His mother stated that past therapy had helped, but that she did not follow up because the family moved often. He reportedly enjoyed drawing and playing football. On November 30, 2000, the psychiatrist diagnosed Terrance with attention deficit disorder (ADD) with behavioral problems and assigned a GAF of 41. (Tr. 169, 171, 173-74.)
In October 2001, plaintiff sought treatment for Terrance at the Edgewood Children's Center (Edgewood). The staff there worked with his mother and stepfather regarding parenting techniques and the psychiatrist prescribed medication for attention deficit hyperactivity disorder (ADHD). The therapist, Paul Padberg, worked with Terrance and recommended a neurological evaluation due to his low cognitive functioning and history of head injuries. (Tr. 179, 182, 184.)
In November 2001, Saber Girgis, M.D. at the Hopewell Center assigned a GAF of 40 and reported that Terrance was disruptive at school and showed increased motor *850 behavior and impulsiveness. (Tr. 163-64, 166.)
In February 2002, Terrance was admitted to Depaul Health Center after his mother found him with a razor and Ritalin tablets. He stated that he was about to take the pills because "the principal and children at school lied about him painting the walls." He also stated that he wanted to die because he "didn't belong in this world." (Tr. 207.)
Upon admission, Terrance reported difficulty concentrating, paying attention, and staying on task. He admitted that he sometimes heard voices which told him to steal, but this was usually after the thought of stealing entered his mind. LaRhonda R. Jones, M.D., noted that Terrance's hygiene was fair, speech was monotone, and insight and judgment were poor. She diagnosed him with depressive disorder, ADHD, and a GAF was 30. She placed him on suicide precautions and prescribed Zoloft[1] and Concerta[2]. (Tr. 207-09.)
In May 2002, Terrance's mother took him to St. John's Mercy Medical Center for outpatient psychiatric care. Joshua W. Calhoun, M.D. noted that Terrance was age appropriately dressed and cooperative, but that his mood was "sad" and his affect was depressed. Dr. Calhoun's diagnosis was depressive disorder-recurrent, but he ruled out conduct disorder. By June 2002, Terrance appeared less depressed and had a bright affect. Nonetheless, Dr. Calhoun doubled the Zoloft. (Tr. 157-58.)
In July 2002, Terrance underwent a neuropsychological evaluation. During this examination, it was revealed that, at age 6, Terrance was hit by a truck and briefly lost consciousness. The following year, he was hit in the head by a pellet gun. Plaintiff reported no serious changes in his behavior after those injuries. The psychiatrist at Hopewell Center placed Terrance on Concerta and Zoloft, but his mother took him off both medications because he acted like a "zombie and foam[ed] at the mouth ... it was awful." She reported that he had recently failed the ninth grade due to poor grades and unexplained absences, having missed 80 days of school. He was asked to leave on the last day of school due to allegations of his attempted rape of another student. He had attended several schools and performed well until the fifth grade. (Tr. 190-91.)
Plaintiff reported Terrance was withdrawn and depressed, having significant trouble academically and socially in school, got into fights with his siblings and school peers, and tried to set things on fire. She further reported that overall treatment through Edgewood led to significant improvements in the family's home life, but his behavior has significantly worsened over the past year. (Tr. 192.)
Terrance's neuropsychological evaluation consisted of a one-session clinical interview and a one-session testing. He appeared bored during the testing session and responded to most questions with short answers. He was caught stealing money from the examiner's wallet. On a test for visual attention he showed difficulty sustaining attention more than 10 minutes. His attention was variable. Memory tests placed him in the borderline range (2nd percentile) to impaired range (1st percentile). His memory for verbally related stories was in the average range (25th percentile) while his memory for spatial arrangement was impaired (1st to 5th percentiles). His ability to develop a strategy, self-monitor, and shift between *851 mental sets (all considered executive functions) appeared impaired. Pursuant to behavioral checklists, Terrance's mother, stepfather, and therapist Paul Padberg indicated social, thought, and attention problems, as well as delinquent behavior. (Tr. 193-95.)
Stephen Kanne, Ph.D., stated that the results of the testing were consistent with Terrance's previous ADHD diagnosis. A further diagnosis of conduct disorder was warranted due to Terrance's behavior at home, school, and during the examination. His difficulty with sustained attention was confirmed during testing and was consistent with observation from his parents and counselor. He showed significant difficulty maintaining the rules of a complex, multi-step task to completion. His impaired judgment would affect his ability to learn at school and exacerbate problem behavior. Dr. Kanne did not believe that Terrance's impairments were a result of serious head injuries, but rather attributed them to his diagnosis of ADHD and other behavioral concerns. Terrance was considered at high risk for future depressive episodes. Dr. Kanne recommended team-oriented and community-based interventions with mental health professionals, behavioral specialists, juvenile authorities, and school staff. He believed that Terrance would benefit from individual tutoring, small group learning, and the use of checklists and notebooks to help with attention and organization. (Tr. 195-98.)
Michael Kent, M.D., took over Terrance's outpatient psychiatric care from Dr. Calhoun. On July 30, 2002, Terrance reported that he continued to feel significantly depressed and sad and had passive thoughts of death, but no suicidal thoughts. His mother stated that he had difficulty staying focused and was having problems with another boy who was trying to pick a fight. During the examination, his grooming, insight, and judgment all appeared fair. Dr. Kent diagnosed major depressive disorder (chronic, recurrent), oppositional defiant disorder, and ADHD by history. Ritalin was found to be of some help at times with his ADHD. Dr. Kent maintained Terrance on 100 milligrams of Zoloft for depression and prescribed Adderall[3] for his attention problems. (Tr. 156, 159.)
In November 2002, Dr. Kent noted that Terrance was suspended from school in September and his mood was better. In a February 28, 2003 letter, Dr. Kent stated that he had lost contact with Terrance and last saw him November 2002. (Tr. 154-55.)
C. The Hearing Testimony
At the hearing before the Administrative Law Judge (ALJ) on March 5, 2003, Terrance's mother testified to the following: Terrance would have to repeat the ninth grade next year. He had been having problems at school since the sixth grade. He saw a psychiatrist every three months and was on Adderall and Wellbutrin.[4] He was recently suspended for 4 days for skipping class. He had also been suspended the previous month for fighting and stealing and had been to juvenile court for writing graffiti on school walls. He was earning Ds and Fs. (Tr. 252-55.)
Plaintiff further testified that Terrance missed 200 to 250 days of school the previous year due to suspensions and other reasons. He enjoyed drawing and some limited time on the computer. He frequently got into fights with other kids and did not get along with the teachers unless they "baby him." He has crying spells with no apparent trigger. He has poor *852 concentration; she has to remind him to do his homework and has to stay with him until completion. (Tr. 262-66.)
Terrance testified that he enjoyed playing basketball and did not get along with kids at school because they try to fight him. (Tr. 264, 67.)
D. The ALJ's Decision
In a May 10, 2003 decision denying benefits, the ALJ made the following enumerated findings:
1. The child has not engaged in substantial gainful activity since the alleged onset of disability (20 CFR § 416.972);
2. The child has attention deficit hyperactivity disorder, a depressive disorder, a learning disorder and a conduct disorder, which are severe impairments (20 CFR § 416.924(c));
3. The testimony and reports by the child and his mother are generally credible;
4. The limitations resulting from the effects of the child's impairments do not medically meet, medically equal, or functionally equal the criteria of any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 (20 CFR § 416.924(d));
5. The child does not have a combination of medically determinable physical or mental impairments that result in marked and severe functional limitations;
(Tr. 22.)
With regard to interacting and relating with others, the ALJ noted Terrance had a history of fighting, theft and antisocial behavior. However, he further explained that Terrance has generally appropriate behavior when he attends school and deals with peers, and that Terrance has friends and gets along with family members. Therefore, he has no more than mild impairment in this domain. (Tr. 21.)
Terrance's ability with regard to acquiring and using information was determined to be a "less than marked" impairment, as Terrance's academic issues were addressed by altering his instructional setting and providing special education resources. Further, one of Terrance's teachers indicated Terrance was typically ahead of the other children in class, finished his work on time, followed directions, was alert and was intelligent. (Tr. 20.)
The ALJ additionally determined that Terrance had "less than marked" impairment in attending and completing tasks. While Terrance has been diagnosed with ADHD, he receives medication for this condition, which controls his symptoms, and also receives specialized school instruction. Moreover, he appears to work at a reasonable pace, change activities age-appropriately, finish tasks to completion and maintain focus and attention in some circumstances. (Tr. 20.)
Plaintiff's request for review by the Appeals Council was denied. Thus, the ALJ's decision became the final decision subject to this judicial review.
On appeal, plaintiff argues that substantial evidence does not support the ALJ's decision because Terrance met the requirements for Listing 112.11 or functionally equaled Listing 112.11. Specifically, plaintiff argues that there was not substantial evidence to conclude Terrance failed to meet the ADHD listing, or for the ALJ to conclude he was less than markedly limited in the areas of (1) interacting and relating with others, (2) attending and completing tasks, and (3) acquiring and using information. (Doc. 19 at 14-17.)

II. DISCUSSION
A. General Legal Framework
The court's role on review is to determine whether the Commissioner's *853 findings are supported by substantial evidence in the record as a whole. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir.2002). "Substantial evidence" is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id.; accord Jones v. Barnhart, 335 F.3d 697, 698 (8th Cir.2003). In determining whether the evidence is substantial, the court considers evidence that detracts from, as well as supports, the Commissioner's decision. See Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir.2000). So long as substantial evidence supports that decision, the court may not reverse it merely because substantial evidence in opposition exists in the record or because the court would have decided the case differently. See Krogmeier, 294 F.3d at 1022. However, the court may reverse the Commissioner's decision and remand for the award of benefits if substantial evidence is overwhelmingly in the claimant's favor. Buckner v. Apfel, 213 F.3d 1006, 1011 (8th Cir.2000); see also Ingram v. Barnhart, 303 F.3d 890, 895 (8th Cir.2002).
To meet or medically equal a listing, a child's impairments must equal the severity of a set of criteria for an individual listing impairment. 20 C.F.R. § 416.924(d). To meet ADHD Listing 112.11, there must be medically documented instances of marked inattention, impulsiveness and hyperactivity. Additionally, the child must also exhibit two of the following:
a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests...; or
b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or
c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or
d. Marked difficulties in maintaining concentration, persistence or pace.
Appendix 1, Subpart P, Listings Nos. 112.11, 112.02(B2) (20 C.F.R. part 404) (2002).
If a child has a severe impairment or combination of impairments that does not meet or medically equal any listing, as the ALJ determined in this case, the Commissioner will decide whether the plaintiff has limitations that "functionally equal the listings" of disabling conditions. See 20 C.F.R. § 416.926a(a) (2002). To equal the listings functionally, the impairment or impairments must be of listing-level severity, i.e., result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. Id.
There are six domains: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and physical well-being. *854 20 C.F.R. § 416.926a(b)(1)(i)-(vi) (2002). A child has a marked limitation in a domain if the impairment "interferes seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2) (2002). A marked limitation can also be found if the child has a valid score that is two standard deviations or more below the mean, but not less than three standard deviations, on a comprehensive standardized test designed to measure a particular domain. 20 C.F.R. 416.926a(e)(2)(iii) (2002). An extreme limitation "interferes very seriously" with such an ability. 20 C.F.R. § 416.926a(e)(3) (2002). Additionally, a child can be characterized as having an extreme limitation if his test scores are at least three standard deviations below the mean. 20 C.F.R. § 416.926a(e)(3)(iii) (2002).
When evaluating a claimant's ability to function in each domain, the Commissioner asks for and considers information that will help to answer the following questions: What activities is the child able to perform? What activities is the child unable to perform? Which of the child's activities are limited or restricted compared to other age-equivalent children who do not have impairments? Where does the child have difficulty with activities  at home, in childcare, at school, or in the community? Does the child have difficulty independently initiating, sustaining, or completing activities? What kind of help does the child need to do activities, how much help is needed, and how often is it needed? 20 C.F.R. § 416.926a(b)(2)(i)-(v) (2002).
These questions are not, singularly or as a whole, the only factors useful to determining whether or not a child has a "marked" or "extreme" limitation. 20 C.F.R. § 416.926a(e)(2)(4)(i) (2002). If applicable, test scores can be used in combination with other factors, observations and evidence to determine the level of impairment. Id. "Marked" or "extreme" limitations as defined by test scores are not automatically conclusive if additional evidence in the record shows a pattern of behavior inconsistent with test scores. See 20 C.F.R. § 416.926a(e)(4) (2004).
B. ADHD Listing 112.11
The ALJ determined the record did not reflect medically documented findings of marked inattention or marked hyperactivity. There is no indication for review on what evidence, or lack of evidence, the ALJ relied in reaching this conclusion. The ALJ noted Terrance was medically diagnosed with ADHD, but failed to recognize that a diagnosis of ADHD itself requires a clinician to assess the child's level of inattention, hyperactivity, and impulsivity to reach an ADHD diagnosis. See Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 92-93 (4th ed.2000).[5] To diagnose a child as having ADHD, a clinician must find either marked inattention or marked hyperactivity over a period of time. Therefore, the ADHD diagnosis alone reflects a medically documented finding of marked inattention, marked hyperactivity, or both.
In addition to the ADHD diagnosis, the record indicates both inattention and hyperactivity. School records suggest Terrance has difficulty following rules, has difficulty remaining on task, has a short attention span, and appears fidgety and *855 restless in the classroom. Plaintiff, whose testimony the ALJ found generally credible, testified that Terrance did not concentrate well and will not attend to homework or household chores without someone standing over him to keep him on task. (Tr. 105, 266.)
The medically documented diagnosis of ADHD, instances of both inattention and hyperactivity on the record, and the ALJ's failure to support his conclusion that there are no medically documented findings of marked inattention and hyperactivity show a lack of substantial evidence for which the ALJ could have based his decision. Therefore, unequivocal evidence establishes the existence of marked inattention or marked hyperactivity.
Given this conclusion, it is necessary to review the part "B" criteria for Listing 112.02. In keeping with the ALJ's opinion, this court will combine its discussion of the part "B" criteria with corresponding domains of functioning.
C. Social Functioning/Interacting and Relating with Others
When analyzing the domain of interacting and relating with others, the Commissioner considers how well the child initiates and sustains emotional connections with others, develops and uses the language of the child's community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. 20 C.F.R. § 416.926a(i) (2002). Examples of limited functioning in this domain are that the child has no close friends or has friends that are all older or younger than the child; avoids or withdraws from people the child knows, or is overly anxious or fearful of meeting new people or trying new experiences; has difficulty playing games or sports with rules; has difficulty communicating with others, e.g., in using verbal and nonverbal skills for self-expression, carrying on a conversation, or in asking for assistance; and has difficulty speaking intelligibly. 20 C.F.R. § 416.926a(i)(3)(ii)-(vi) (2003).
Although the ALJ could have articulated more clearly the basis for not finding a marked limitation in this domain, substantial evidence nonetheless supports the determination that Terrance had no more than a mild impairment. The record and the ALJ indicated that Terrance has a history of fighting, theft, and general antisocial behavior. However, the record further indicates that Terrance maintains good interpersonal skills, enjoys playing sports, has neighborhood friends, and communicates effectively with others. Moreover, plaintiff's brief acknowledges that Terrance's teachers found him to maintain good relationships with peers and authority figures.
D. Cognitive-Communicative Functioning/Acquiring and Using Information
When analyzing the domain of acquiring and using information, the Commissioner must consider how well a child acquires or learns information and how well the child uses that information. 20 C.F.R. § 416.926a(g) (2002). A child 12 to 18 years old should be able to demonstrate what he has learned in school and in his daily activities, use increasingly complex language and grammar, and be able to prepare for entry into the workforce. 20 C.F.R. § 416.926a(g)(2)(v) (2002). Examples of limited functioning in this domain include an inability to demonstrate understanding of words about space, size or time; difficulty recalling information recently learned in school; difficulty solving mathematical problems and computations; and difficulty communicating more than in simple sentences, with difficulty explaining *856 what the child means. 20 C.F.R. § 416.926a(g)(3)(i)-(v) (2002).
The ALJ's determination that Terrance's impairments in this domain are "less than marked" is not supported by substantial evidence. The ALJ bases his finding primarily on a single report from Terrance's art teacher stating Terrance is intelligent, follows directions, and completes his work on time. Additionally, the ALJ suggests that Terrance's school performance is due in part to excessive absenteeism.
An ALJ is not required to explain all the evidence in the record. Craig v. Apfel, 212 F.3d 433, 436 (8th Cir.2000). Simply because a matter is not referenced in the opinion does not mean the ALJ failed to rely on the evidence in making his determination. Id. However, this does not give an ALJ the opportunity to pick and chose only evidence in the record buttressing his conclusion. See Robinson v. Barnhart, 366 F.3d 1078, 1083 (10th Cir.2004) ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of non [-]disability."); Switzer v. Heckler, 742 F.2d 382, 385-86 (7th Cir.1984) (stating an ALJ cannot "pick and choose" only the evidence that supports his position); Marnell v. Barnhart, 253 F.Supp.2d 1052, 1082 (N.D.Iowa 2003) ("[T]he ALJ's failure to substantiate his conclusions adequately constitutes error."); cf. Hon v. Heckler, 585 F.Supp. 1300, 1304 (W.D.Mo.1984) ("[T]he hypothetical questions posed to vocational experts must precisely set out all of the claimant's impairments. Thus, the ALJ was not free to pick and choose.)"
As the Eighth Circuit noted,
[an] ALJ may have considered and for valid reasons rejected the ... evidence proffered...; but as [the ALJ] did not address these matters, [the court] is unable to determine whether any such rejection is based on substantial evidence. Initial determinations of fact and credibility are for the ALJ, and must be set out in the decision.
Jones v. Chater, 65 F.3d 102, 104 (8th Cir.1995); see also Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir.1984) ("Every conflict in the record [need not be] reconciled by the ALJ... the crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence."); Pacheco v. Barnhart, No. 03-CV-3235, 2004 WL 1345030 at *4 (E.D.N.Y. June 14, 2004) (stating an ALJ should acknowledge all relevant evidence or explain why it should be rejected. In doing so, the ALJ will fulfill his duty to provide sufficient reasoning for his opinion so a fair and just determination can be made on review).
In this case, the ALJ focuses on Terrance's art teacher's report to the exclusion of other evidence in the record reaching opposite conclusions. The ALJ failed to acknowledge observations of Terrance's other teachers recognizing severe problems with sight word vocabulary, decoding skills, losing place, skipping words, understanding word meaning, understanding meaning of sentences, using context cues, drawing inferences and conclusions, a reluctance or strong dislike to read, accurately writing information dictated by others, using incorrect grammar construction, using primarily short, simple sentence structure, limited writing vocabulary, inability to express ideas or meaning clearly when writing, reversing letters when writing, lack of basic math function, careless computational errors, multi-step computations, inability to solve word problems, inability to repeat or imitate sentences that were just spoken, sequencing information heard in class, and language usage and pragmatics. (Tr. 100-03.)
*857 Moreover, testing and evaluations determined that Terrance functions four to six grade levels below his current grade in the areas of reading, spelling and mathematics. Terrance also exhibits borderline to impaired functioning in memory testing, and his neuropsychological evaluation concluded that his performance on memory testing will affect his ability to learn new information in school. (Tr. 196.)
Upon review of the entire record, there is a multitude of evidence suggesting marked limitation in this domain. While it is not the court's province to re-weigh the evidence and make its own determination, see Krogmeier, 294 F.3d at 1022, in light of the record and the ALJ's failure to explain his reliance on certain evidence to the exclusion of evidence to the contrary, the court concludes substantial evidence does not support the ALJ's position. Rather, aside from the art teacher's report, the evidence is overwhelming that Terrance suffers from a marked limitation in this area of functioning.
E. Concentration, Persistence and Pace/Attending and Completing Tasks
When analyzing the domain of attending and completing tasks, the Commissioner must consider how well the child is able to focus, maintain attention, and begin, carry out and finish activities. 20 C.F.R. § 516.926a(h) (2002). A child between 12 and 18 years old should be able to pay attention to long discussions, organize his materials, plan time effectively, and not be distracted by, or be a distraction to, peers. 20 C.F.R. § 516.926a(h)(3) (2002). Examples of limited functioning in this domain include being easily distracted or overactive to sounds, movement or touch; being slow to focus or to complete activities of interest to you; being frequently sidetracked from activities or frequently interrupting others; and requiring extra supervision to keep on task or activity. 20 C.F.R. § 516.926a(h)(3)(i)-(v) (2002).
Similar to the domain of acquiring and using information, the ALJ does not cite relevant support for his conclusions, nor reconcile his opinion with substantial evidence to the contrary.
The record indicates Terrance exhibits severe problems at school in the following areas: easily distracted, short attention span, reluctant to begin tasks, gives up easily, does not complete tasks, organizing or appropriately using time, performing work in a careless manner, needing directions repeated, needing reteaching, working slowly, requiring additional time to complete work, and making transitions.
A neuropsychological evaluation determined Terrance has significant difficulty maintaining the rules of a complex, multi-step task in order to be able to complete such a task successfully. Additionally, he is impaired in his ability to implement organizational strategies and shift between mental sets. The examiner noted these impairments are consistent with Terrance's diagnosis of ADHD and demonstrate he has impaired judgment, which will affect both his ability to learn and his behavior.
To the contrary, the ALJ stated that Terrance works at a reasonable pace, finishes activities he starts and changes activities in an age appropriate fashion, and that Terrance's symptoms are well-controlled with medication. However, the ALJ provided no citation to the record. It is not the job of this court to search the record for factual bases for the ALJ's decision. See Jones, 65 F.3d at 104 ("[W]e cannot speculate whether or why an ALJ rejected certain evidence."). For these reasons, there is not substantial evidence on the record to support the ALJ's conclusion that Terrance has less than marked *858 limitation in this domain. Rather, the record appears to be overwhelming that he has a marked limitation in this domain.
For the reasons set forth above, it appears that Terrance meets the ADHD Listing 112.11. Therefore, the decision of the Commissioner of Social Security is reversed and the action is remanded to the Commissioner for the award of a period of disability and resultant benefits as alleged. An appropriate order shall issue herewith.
NOTES
[1] Zoloft is indicated for the treatment of depression. Physician's Desk Reference, 2553 (55th ed.2001).
[2] Concerta is for the treatment of ADHD. Id. at 3474.
[3] Adderall is indicated for the treatment of ADHD. Id. at 3034.
[4] Wellbutrin is indicated for the treatment of depression. Id. at 1485.
[5] DSM-IV-TR criteria for diagnosing ADHD are (1) six or more of a list of symptoms for inattention or six or more symptoms of a list of symptoms for hyperactivity-impulsivity; (2) some hyperactive-impulsive or inattentive symptoms that caused impairment and were present before age 7; (3) some impairment from the symptoms present in two or more settings; (4) clear evidence of clinically significant in social, academic, or occupational functioning; and (5) symptoms do not occur exclusively during the course of another mental or developmental disorder. DSM-IV-TR at 92-93.